1  JOHNSON & WEAVER, LLP
   Frank J. Johnson (SBN 174882)
2  frankj@johnsonandweaver.com
   Shawn E. Fields (SBN 255267)
3  shawnf@johnsonandweaver.com
   110 West "A" Street, Suite 750
4  San Diego, CA 92101
   Telephone: (619) 230-0063
5  Facsimile: (619) 255-1856

6  *Attorneys for Plaintiff*

7

8              **UNITED STATE DISTRICT COURT**

9           **NORTHERN DISTRICT OF CALIFORNIA**

10

11 RALPH SARACENI, derivatively on          Case No.:
   behalf of POLYCOM, INC.,

12          Plaintiff,                        VERIFIED SHAREHOLDER DERIVATIVE
                                              COMPLAINT FOR BREACH OF
13      v.                                    FIDUCIARY DUTY, UNJUST
                                              ENRICHMENT, AND WASTE OF
14 ANDREW M. MILLER, BETSY S.                 CORPORATE ASSETS
   ATKINS, JOHN A. KELLEY, D. SCOTT
15 MERCER, WILLIAM A. OWENS, and
   KEVIN T. PARKER,                           DEMAND FOR JURY TRIAL

16          Defendants,

17
   and
18
   POLYCOM, INC.,
19
            Nominal Defendant.
20

21

22

23

24

25

26

27

28

―――――――――――――――――――――――――――――――――――――――――
   VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY,
           UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS

By and through his undersigned counsel, Plaintiff Ralph Saraceni ("Plaintiff") brings this shareholder derivative action on behalf of Polycom, Inc. ("Polycom" or the "Company") and against certain current and former officers and directors of the Company for breaches of fiduciary duties and unjust enrichment.  Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which include, without limitation: a) review and analysis of public filings made by Polycom and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; c) review of news articles, shareholder communications, postings on Polycom's website concerning the Company's public statements; and d) review of other publicly available information concerning Polycom and the Individual Defendants (defined herein).

## I.     INTRODUCTION

1.     Nominal Defendant Polycom is a San Jose-based provider of unified communications (UC) solutions and a provider of telepresence, video, voice and infrastructure solutions based on open standards.

2.     From approximately July 24, 2012 through July 23, 2013 (the "Relevant Period"), the Individual Defendants issued or authorized the issuance of materially false and misleading statements regarding the Company's controls and business practices.  Specifically, the Individual Defendants failed to disclose that the Company maintained inadequate controls to prevent its officers from submitting improper expense reimbursements and that its Chief Executive Officer ("CEO"), defendant Andrew M. Miller ("Miller") was in fact submitting improper reimbursement requests.  As a result of these materially misleading statements, Polycom stock traded at artificially inflated prices during the Relevant Period, reaching a high of $12.01 per share in intraday trading on September 14, 2012.

3.     On July 23, 2013, Polycom announced in a regulatory filing that Miller had stepped down as CEO, President and a director after accepting responsibility for certain irregularities in his expense submissions.  This acknowledgement of responsibility came after

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS

1    Polycom's Audit Committee, on July 17, 2013, had completed "a review of certain of Mr.

2    Miller's expense submissions" and found "certain irregularities in these submissions."

3    Polycom's newly-appointed interim CEO, defendant Kevin T. Parker ("Parker"), expressed his

4    "disappointment" in Miller's having to tender his resignation under these circumstances.

5        4.    On this news, the price of Polycom stock declined by 15%, closing at $9.49 per

6    share on July 24, 2013, down $1.69 per share on unusually high trading volume.

7        5.    The true facts, which were known or recklessly disregarded by the Individual

8    Defendants but concealed from the investing public during the Relevant Period, were as

9    follows:

10           a) Polycom's CEO was submitting improper expense reimbursements; and

11           b) Polycom's internal controls were inadequate to prevent its officers from

12              submitting improper reimbursement requests.

13       6.    Because of the Individual Defendants' materially misleading statements and

14   failure to maintain adequate internal controls, Polycom stock traded at inflated levels during

15   the Relevant Period.  However, after the above revelations seeped into the market, the price of

16   Polycom stock was hammered by massive sales, sending it down nearly 21% from its Relevant

17   Period high.

18       7.    Moreover, on the eve of the Company publicly announcing that Miller had

19   accepted responsibility for submitting improper expense reimbursement requests, and

20   announcing that Miller had submitted his resignation related to this misconduct, upon

21   information and belief, with the authorization, knowledge and approval of the Individual

22   Defendants, Miller entered into a "Separation Agreement and Release" with Polycom, under

23   which Miller was promised a $500,000 cash payment, assured continued eligibility for a bonus

24   for the first half of 2013, promised a year's reimbursement (through another cash payment) of

25   COBRA expenses, and allowed to keep expensive company computer and mobile

26   telecommunications equipment.  The Separation Agreement and Release also allowed Miller

27   to remain a Polycom "employee" though August 15, 2013, and continue to receive his normal

28   base salary (while simultaneously agreeing that he "would not report to work" and that his

2

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY,
UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS

email and network access would terminate upon public announcement of his resignation. Miller was allowed to remain an "employee" until August 15, 2013 so that he could be awarded yet more compensation, in the form of 50,000 shares of Company stock through a Restricted Stock Unit Award, and potentially as much as an additional 75,000 shares of Company stock through a Performance Share Award. Both "awards" were unvested as of the date of Miller's resignation, but would vest before Miller's last day as an "employee."

8.      The Polycom Board of Directors ("Board") has not, and will not commence litigation against the Individual Defendants—*i.e.*, themselves, let alone vigorously prosecute such claims, because the Individual Defendants face a substantial likelihood of liability to Polycom for authorizing or failing to correct the false and misleading statements alleged herein. Accordingly, a pre-suit demand upon the Polycom Board is a useless and futile act. Thus, Plaintiff rightfully brings this action to vindicate Polycom's rights against its wayward fiduciaries and hold them responsible for the damages they have caused Polycom.

## II.      JURISDICTION AND VENUE

9.      This Court has jurisdiction over all claims under 28 U.S.C. §1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10.      Venue is proper in this Court because Polycom's principal executive offices are located at 6001 America Center Dr., San Jose, CA 95002, where the day-to-day operations of the Company are directed and managed. Moreover, Plaintiff's claims arose in this District, Plaintiff has suffered and will continue to suffer harm in this District, and each Defendant has extensive contact with California.

11.      A true and correct copy of this Complaint was delivered to Polycom before its filing with the Court.

## III.      THE PARTIES

12.      Plaintiff first purchased Polycom common stock on or about 2001, and has continuously held his Polycom stock ever since. Plaintiff is a citizen of Massachusetts.

13.     Nominal Defendant Polycom is a Delaware corporation with its principal place of business located at 6001 America Center Dr., San Jose, CA 95002.

14.     Defendant Miller was, at all times during the Relevant Period, Polycom's President, CEO, and a director until his resignation on or about July 19, 2013.   Upon information and belief, Miller is a citizen of South Carolina and Florida.

15.     Defendant Betsy S. Atkins ("Atkins") is a director of the Company, member of the Corporate Governance & Nominating Committee, and Chair of the Compensation Committee.  Upon information and belief, Atkins is a citizen of Florida.

16.     Defendant John A. Kelley ("Kelley") is a director of the Company, member of the Audit Committee, and Chair of the Corporate Governance & Nominating Committee.   Upon information and belief, Kelley is a citizen of Colorado.

17.     Defendant D. Scott Mercer ("Mercer") is a director of the Company, a member of the Corporate Governance & Nominating Committee, and Chair of the Audit Committee.  Upon information and belief, Mercer is a citizen of California.

18.     Defendant Parker is a director of the Company.  During the Relevant Period, Parker was also a member of the Company's Audit Committee.  Parker was named interim-CEO after Miller announced his resignation.   Upon information and belief, Parker is a citizen of Virginia and Utah.

19.     Defendant William A. Owens ("Owens") is a director of the Company and member of the Compensation Committee.  While not a member of the Audit Committee during the Relevant Period, Owens was named to the Audit Committee (as Parker's replacement) after Miller's resignation was announced and Parker became interim CEO.  Upon information and belief, Owens is a citizen of California and Washington.

20.     Defendants Atkins, Kelley, Mercer, Owens, and Parker are all current Board members and are collectively referred to as the "Board" or the "Director Defendants."

21.     Defendants Kelley, Mercer, and Parker are sometimes collectively referred to herein as the "Audit Committee Defendants."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS

22.     Defendants Miller, Atkins, Kelley, Mercer, Parker, and Owens are sometimes collectively referred to herein as the "Individual Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background to the Relevant Period

23.     Polycom was founded in 1990 and is headquartered in San Jose, California.

24.     Polycom is a provider of UC solutions and a provider of telepresence, video, voice and infrastructure solutions based on open standards.  With Polycom RealPresence video and voice solutions, from infrastructure to endpoints, people all over the world can collaborate face-to-face without being in the same physical location.  The Company has several operating segments: Americas, which consist of North, Central and Latin Americas; Europe, Middle East and Africa; and Asia Pacific.  The products and solutions include Network Infrastructure, UC Group Systems and UC Personal Devices, which includes desktop video devices and wireless local area network products.

25.     In its 2012 Proxy Statement, the Individual Defendants caused the Company to describe its business ethics practices thusly:

**Corporate Governance Principles and Code of Business Ethics and Conduct**

Polycom believes that strong corporate governance practices are the foundation of a successful, well-run company.  ***Polycom is committed to establishing an operating framework that exercises appropriate oversight of responsibilities at all levels throughout Polycom and managing its affairs consistent with high principles of business ethics.***  The Board has adopted Corporate Governance Principles that set forth our principal corporate governance policies, including the oversight role of the Board.  The Board first adopted these Corporate Governance Principles in 2003 and has refined them from time to time.  The Corporate Governance Principles are available on Polycom's website at *www.polycom.com/company/investor_relations/ corporate_governance*.

In addition, Polycom has adopted a Code of Business Ethics and Conduct, which is applicable to our directors and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions.  The Code of Business Ethics and Conduct is available on Polycom's website at *www.polycom.com/company/investor_relations/ corporate_ governance*.

**The website policy (revised November 2012) stated:**

**(iii)  Polycom Fund**

*Polycom funds must be used only for Polycom business purposes.* Every Polycom employee, agent and contractor must take reasonable steps to ensure that Polycom received good value for Polycom funds spent, and must maintain accurate and timely records of each and every expenditure.  Expense reports must be accurate and submitted in a timely manner.  Polycom employees, agents and contractors must not use Polycom funds for any personal purpose.  Polycom agents or contractors are not allowed to exercise control over Polycom funds.

**B.       The Individual Defendants Make Materially Misleading Statements**

26.     On July 24, 2012, the Individual Defendants caused Polycom to issue a press release announcing its second quarter 2012 financial results.  The Company reported net income of $7 million, or $0.04 diluted earnings per share ("EPS"), and net revenues of $359 million for the second quarter ended June 30, 2012.  The release stated, in pertinent part:

"Demand for our best in class UC solutions was solid in Q2, which allowed us to exceed both revenue and earnings expectations," stated Andrew M. Miller, Polycom President and Chief Executive Officer.  "In the second half of this year, we will be launching a series of products that we believe will be game-changing and will allow us to expand our addressable market and extend our advantages versus the competition.  Most recently, we launched the new Polycom® RealPresence® Resource Manager offering that further differentiates our Polycom® RealPresence® Platform with support for large scale video deployments of up to 10,000 endpoints, including mobile devices, multi-tenancy for service providers to deliver Video-as-a-Service cost-effectively, and a new suite of rich, open APIs that extends the value and ecosystem around our RealPresence Platform."

"Our overall performance was better than expected, although we are closely monitoring demand in Europe," continued Eric Brown, Polycom Chief Operating Officer and Chief Financial Officer.  "Our primary focus for the balance of the year will be allocating resources to support our key upcoming new product launches."

27.     On August 1, 2012, the Individual Defendants caused Polycom to file its Form 10-Q with the SEC for its second quarter ended June 30, 2012.  The Form 10-Q also included a certification by Miller, which stated:

I, Andrew M. Miller, certify that:

•       I have reviewed this quarterly report on Form 10-Q of Polycom, Inc.;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS

- Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

- Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

- The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

  - Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

  - Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

  - Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

  - Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

- The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

  - a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS

- b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

28. On September 14, 2012, Polycom's common stock reached its Relevant Period high of $12.01 per share.

29. On October 23, 2012, the Individual Defendants caused Polycom to issue a press release announcing its third quarter 2012 financial results. The Company reported net income of $(15.0) million, or $(0.08) diluted EPS, and revenue of $335 million for the third quarter ended September 30, 2012. The release stated in part:

> "Demand for our best in class UC&C solutions was solid in Q3, which allowed us to come in at the high end of our revenue expectations and exceed our earnings expectations," stated Andrew M. Miller, Polycom President and Chief Executive Officer. "We have been taking market share in 2012 as a result of our open standards-based Polycom® RealPresence® Platform and compelling cost of ownership advantage. Earlier this month on October 8, we unveiled a comprehensive set of breakthrough products launching in Q4 2012 and early 2013, that we believe will further distance us from the competition, expand our total addressable market, and drive mass adoption of video collaboration."
>
> "Our overall Q3 performance was at the high end of our expectations, with North America showing strength. We reported a sequential increase in deferred revenue and operating cash flow," continued Eric Brown, Polycom Chief Operating Officer and Chief Financial Officer. "Q4 is an important quarter for Polycom, as we release a comprehensive set of new products, starting with the Polycom® RealPresence® Group Series solutions in November 2012."

30. On October 31, 2012, the Individual Defendants caused Polycom to file its Form 10-Q with the SEC for the third quarter ended September 30, 2012. The Form 10-Q also included a certification by Miller and further contained the same results reported in the Company's October 23, 2012 press release.

31. On January 23, 2013, the Individual Defendants caused Polycom to issue a press release announcing its fourth quarter and year ended 2012 financial results. The Company reported net income of $2 million, or $0.01 diluted EPS, and revenue of $353 million for the fourth quarter ended December 31, 2012. Additionally, the Company reported net income of $9.75 million, or $0.06 diluted EPS, and revenue of $1.39 million for the year ended December 31, 2012. The release stated in part:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS

"Polycom has executed very well, demonstrating clear product leadership during the UC&C market transition in 2012," stated Andrew M. Miller, Polycom President and Chief Executive Officer. "We are excited to begin 2013 with what we believe is the most comprehensive product portfolio in the industry and improved sales and go-to-market capabilities that enable new business models for collaboration, including software, cloud-delivered video, and virtualization."

"We are pleased to report sequential revenue growth in all product categories, including UC Platform, which is above a quarter billion dollar per year run rate," continued Eric Brown, Polycom Chief Operating Officer and Chief Financial Officer. "Services revenue also increased both sequentially and year-over-year in line with our increased focus on this area of the business."

32. On February 14, 2013, the Individual Defendants caused Polycom to file its Form 10-K with the SEC for its fiscal year ended December 31, 2012. The Form 10-K also included a certification by Miller and further contained the same results reported in the Company's January 23, 2013 press release.

33. The Form 10-K stated in part:

**Evaluation of disclosure controls and procedures**

Our management evaluated, with the participation of our Chief Executive Officer and our Chief Financial Officer, the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Annual Report on Form 10-K. Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures are effective at a reasonable level of assurance to ensure that information we are required to disclose in reports that we file or submit under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and (ii) is accumulated and communicated to Polycom's management, including our Chief Executive Officer and our Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. Our disclosure controls and procedures include components of our internal control over financial reporting. Management's assessment of the effectiveness of our internal control over financial reporting is expressed at the level of reasonable assurance because a control system, no matter how well designed and operated, can provide only reasonable, but not absolute, assurance that the control system's objectives will be met.

34. On April 23, 2013, the Individual Defendants caused Polycom to issue a press announcing its first quarter 2013 financial results. The Company reported net income of $3 million, or $0.01 diluted EPS, and net revenues of $339 million for the first quarter ended March 31, 2013. The release stated, in pertinent part, as follows:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY,
UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS

"Polycom posted better than expected Q1 results as we continued to deliver industry-leading products and unmatched interoperability, along with strong sales execution," stated Andrew M. Miller, Polycom President and Chief Executive Officer. "With the recent release of our breakthrough Polycom® RealPresence® CloudAXIS™ Suite, Polycom is now shipping an innovative, best-in-class portfolio, which extends secure, enterprise-grade video collaboration to anyone with a Web browser. We remain focused on our long-term strategic plan to make video collaboration ubiquitous in the enterprise."

"We are pleased to report 3 percent year-over-year revenue growth in the Americas, our largest geographic segment, 8 percent year-over-year revenue growth in UC Personal Devices, and 10 percent year-over-year revenue growth in Services," continued Eric Brown, Polycom Chief Operating Officer and Chief Financial Officer. "We remain confident in our competitive position in the unified communications and collaboration marketplace, and we are seeing good traction with our new product releases."

35.     On April 30, 2013, the Individual Defendants caused Polycom to file its Form 10-Q with the SEC for the first quarter ended March 31, 2013. The Form 10-Q contained a certification by Miller and further contained the same results reported in the Company's April 23, 2013 press release.

36.     On July 23, 2013, the price of Polycom's common stock closed at $11.18 per share.

**C.     The Truth is Revealed**

37.     On July 23, 2013, after the market closed, the Individual Defendants caused Polycom to issue a press release announcing its second quarter 2013 financial results. The Company reported net income of $5 million, or $0.03 diluted EPS, and net revenues of $345 million. Subsequently, the Company filed a Form 8-K with the SEC, announcing the resignation of Miller, which stated in pertinent part:

**Item 8.01. Other Events**.

On July 17, 2013, the Audit Committee of the Board completed a review of certain of Mr. Miller's expense submissions. The Audit Committee found certain irregularities in these submissions. At the conclusion of the review, Mr. Miller accepted responsibility and submitted the letter referred to in Item 5.02. The amounts involved did not have a material impact on the Company's previously reported financial statements for any period.

38.     Publicly, through a press release and during an analyst call, Parker – Polycom's then, newly-anointed interim CEO, and a member of Polycom's audit committee during the Relevant Period – lamented how "Andy Miller's resignation under these circumstances is

10

disappointing," and acknowledged how "[t]his is a tough set of circumstances."  Nonetheless, Parker attempted to assure the public through the prepared press release and on the analyst call that Polycom's focus was moving forward, and that Miller's misdeeds should "not be seen as a reflection of the financial integrity of the company."

39.     On this news, the price of Polycom stock declined by 15%, closing at $9.49 per share on July 24, 2013, down $1.69 per share on unusually high trading volume.

40.     The true facts, which were known by the Individual Defendants but concealed from the investing public during the Relevant Period, were as follows:

a)  Polycom's CEO was submitting improper expense reimbursements; and

b)  Polycom's internal controls were inadequate to prevent its officers from submitting improper reimbursement requests.

41.     As a result of the Individual Defendants' materially misleading statements, failure to maintain adequate internal controls, and failure to discharge their fiduciary duties to Polycom and its shareholders, Polycom stock traded at inflated levels during the Relevant Period.  However, after the above revelations seeped into the market, the price of Polycom stock was hammered by massive sales, sending it down nearly 21% from its Relevant Period high.

**D.     The Individual Defendants Cause Polycom to Repurchase Its Common Stock at Artificially Inflated Prices**

42.     While the Individual Defendants were making and/or approving misleading and improper statements that artificially inflated Polycom's stock price, the Director Defendants simultaneously directed or permitted the Company to overpay for its own stock through massive repurchases.   As the Individual Defendants caused the Company to explain in Polycom's April 30, 2013 Form 10-Q, the Director Defendants caused the Company to repurchase $34 million of its own common stock.  Moreover, as discussed in Polycom's July 23, 2013 Form 10-Q, the Individual Defendants authorized an additional $100 million in repurchase allotment in May 2013, and caused the Company to repurchase an additional $50 million of its own common stock during the second quarter of 2013.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS

43.    These Director Defendants knew or recklessly disregarded the fact that the Company's stock was artificially inflated due to the misleading statements alleged herein, and they failed to prevent the Company from repurchasing its stock at inflated prices.   These inflated repurchases caused significant damage to Polycom and was not a valid exercise of business judgment.

**E.    The Individual Defendants Privately Authorize an Unjustified Golden Parachute Payment to Miller**

44.    On the eve of authorizing a press release and public statements decrying Miller's actions – and the day before Polycom's stock would be hammered by the news of Miller's "disappointing" actions – away from the spotlight of press releases and analyst calls, the Individual Defendants quietly negotiated a "Separation Agreement and Release," which, to the detriment of Polycom and its shareholders, awarded Miller a golden parachute:

(a)    The Separation Agreement and Release awarded Miller a lump sum cash payment of $500,000;

(b)    The Separation Agreement and Release confirmed that Miller would continue to be eligible for his bonus for the first half of the 2013 year (despite Miller engaging in the very behavior during this period that caused the "expense irregularities" that ultimately led to his resignation only weeks after the period ended);

(c)    Miller was awarded an additional payment equal to the cost of 12 months of COBRA insurance payments;

(d)    Miller was authorized to keep two company laptops, a company iPad tablet and a company Samsung Galaxy 4 mobile device;

(e)    While Miller resigned on or about July 19, 2013, the agreement set a different, "Separation Date" of August 15, 2013, and confirmed that, in addition to the compensation described above, Miller would continue to receive his regular base salary through the Separation Date; and

(f)    The August 15, 2013 Separation Date, upon information and belief, was also purposefully designed to allow Miller to be awarded a substantial number of additional

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS

Polycom stock shares through both "Restricted Stock Unit Awards" and "Performance Share Awards," which would not vest unless Miller remained an employee of Polycom beyond his July 19, 2013 resignation date; specifically: (i) 50,000 shares under Restricted Stock Unit Awards were "scheduled to vest on 8/1/2013, subject to [Miller's] continued employment with the Company" through that date; and (ii) an estimated target of 50,000 shares, and potentially as many of 75,000 shares, were "eligible to vest upon completion of the award's first performance period ending 7/31/2013, subject to actual performance and [Miller's] continued employment with the Company through the later of August 1, 2013, or the date the independent members of the Company's Board of Directors certify achievement of the applicable performance criteria (expected to occur on August 7, 2013).

45.     The Separation Agreement and Release even agreed to "reimburse [Miller] for his reasonable attorneys' fees and costs incurred in connection with the preparation of" the Separation Agreement and Release and Miller's resignation, up to $25,000.

## V.     DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.     Fiduciary Duties

46.     By reason of their positions as officers, directors, and/or fiduciaries of Polycom and because of their ability to control the business and corporate affairs of Polycom, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Polycom in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Polycom and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

47.     Each director and officer of the Company owes to Polycom and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the

1    Individual Defendants had a duty to promptly disseminate accurate and truthful information

2    with regard to the Company's operations, performance, management, projections, and

3    forecasts so that the market price of the Company's stock would be based on truthful and

4    accurate information.

5            **B. Audit Committee Duties**

6            48.     In addition to these duties, the members of the Audit Committee owed specific

7    duties to Polycom under the Audit Committee's Charter to review and approve quarterly and

8    annual financial statements, earnings press releases, and to ensure that the Company had

9    appropriate and effective internal controls over financial reporting, including reporting for

10   material expense reimbursements by senior executive officers.

11           49.     Specifically, the Charter for the Audit Committee of the Board of Directors of

12   Polycom ("the Audit Committee Charter") defines the audit committee's purpose to be (among

13   other purposes) to:

14           • "provide oversight of (1) the Company's accounting and financial

15               reporting processes, (2) the audit of the Company's financial

16               statements, and (3) the Company's internal control and audit

17               functions;"

18           • "assist the Board of Directors in oversight of (1) the integrity of the

19               Company's financial statements, (2) the Company's internal

20               accounting and financial controls, (3) the Company's compliance with

21               financial and disclosure regulatory requirements, [and] (4) the

22               organization and performance of the Company's internal audit

23               function…;" and

24           • "provide to the Board of Directors such information and materials as it

25               may deem necessary to make the Board aware of significant matters

26               within its oversight role that require the attention of the Board."

27           50.     The Audit Committee Charter also establishes specific requirements regarding

28   the committee's composition, including, in part:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY,
UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS

- "each member will be able to read and understand fundamental financial statements, in accordance with Audit Committee requirements of the Nasdaq rules;

- "at least one member will have past employment experience in financing or accounting, requisite professional certification in accounting, or other comparable experience or background, including a current or past position as a chief executive officer, principal financial officer or other senior officer with financial oversight responsibilities, in accordance with the Audit Committee requirements of the Nasdaq Rules; and

- "at least one member will be an 'audit committee financial expert' as defined in the rules of the SEC."

51.     Upon information and belief, the aforementioned committee requirements are designed to ensure that, provided they otherwise discharge their fiduciary duties, the Audit Committee members have the requisite skill set to proactively guard against, expeditiously identify and correct identified issues or irregularities.

52.     The Audit Committee Charter further delineates specific "responsibilities and duties" of the Audit Committee.  Those duties include (without limitation):

- "reviewing the reports of management, internal audit and the independent auditors concerning the design, implementation and maintenance of the Company's internal controls and procedures for financial reporting, including reviewing before release the Company's disclosure regarding such system of internal controls required under SEC rules to be contained in the Company' periodic filings and the attestations or reports by the independent auditors relating to such disclosure;"

- "reviewing before release the unaudited quarterly operating results in the Company's quarterly earnings release and reviewing and discussing with management the annual audited financial statements and quarterly unaudited

financial statements, including the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations,' prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;"

- "reviewing suggestions for improvements to the internal control systems highlighted by management, internal audit and the independent auditors and management's plan of action to implement such suggestions;"

- "providing oversight and review at least annually of the Company's significant financial and accounting policies, including its investment policies, commitment and expenditure authorization policy, revenue recognition policy, credit policy, foreign currency policy, Related Person Transaction Approval Policy and capital expenditure policy;"

- "reviewing the activities, organizational structure and qualifications of the internal audit function;"

- "reviewing and improving changes to the internal audit charter;"

- "reviewing periodically with the Company's Chief Internal Audit Executive and Compliance Officer and issues encountered in the course of the internal audit function's work;"

- "reviewing matters related to the Company's Compliance Program including receiving periodic reports from management;" and

- "reviewing, approving and discussing compliance with management concerning the Company's code of ethics for its principal executives and senior financial officers."

**C.   Control, Access, And Authority**

53.   The Individual Defendants, because of their positions of control and authority as directors, officers, and/or audit committee members of Polycom, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Polycom.

16

54.     Because of their advisory, executive, managerial, committee and/or directorial positions with Polycom, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Polycom.

55.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Polycom, and was at all times acting within the course and scope of such agency.

**D.     Reasonable And Prudent Supervision**

56.     To discharge their duties, the officers and directors of Polycom were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of Company's financial affairs.  By virtue of such duties, the officers and directors of Polycom were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(d)     remain informed as to how Polycom conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)     ensure that Polycom was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**VI.     BREACHES OF DUTIES**

57.     Each Individual Defendant, by virtue of his or her position as a director, officer, and/or audit committee member, owed to Polycom and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of Polycom, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Polycom, the absence of good faith on their part, and a reckless disregard for their duties to Polycom, and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Polycom.

58.     The Individual Defendants each breached their duty of loyalty and good faith by making, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders concerning the adequacy of the Company's internal controls regarding executive expense reimbursement, and about Miller's compliance with such policies.   In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of the federal securities laws.   As a result, Polycom has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

**VII.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

59.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.   The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

60.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that misled shareholders concerning the adequacy of the Company's internal controls regarding executive expense reimbursement, and about Miller's compliance with such policies.   In furtherance of this plan, conspiracy, and course of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY,
UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS

conduct, the Individual Defendants collectively and individually took the actions set forth herein.

61.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; and (b) disguise and misrepresent the Company's future business prospects.

62.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

63.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VIII.   DAMAGES TO POLYCOM

64.     As a result of the Individual Defendants' wrongful conduct, Polycom disseminated false and misleading statements.  The improper statements have devastated Polycom's credibility.  Additionally, Polycom is now the subject of a securities fraud class action lawsuit.  The Company will face substantial costs in connection with an investigation and the lawsuit.

65.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Polycom's market capitalization has been substantially damaged.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY,
UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS

66.     Further, as a direct and proximate result of the Individual Defendants' conduct, Polycom has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

a.      costs incurred in investigating and defending Polycom and certain officers in a class action lawsuit, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

b.      costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Polycom artificially-inflated stock price and inflated revenues;

c.      costs incurred from substantial compensation, bonuses, and benefits paid, or to be paid, to Miller, despite Miller having resigned because of expense and accounting regularities; and

d.      costs incurred from the loss of the Company's customers' confidence in Polycom services.

67.     Moreover, these actions have irreparably damaged Polycom's corporate image and goodwill.  For at least the foreseeable future, Polycom will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Polycom's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## IX.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

68.     Plaintiff brings this action derivatively in the right and for the benefit of Polycom to redress injuries suffered, and to be suffered, by Polycom as a direct result of the Individual Defendants' breaches of fiduciary duty, unjust enrichment, and corporate waste, as well as the aiding and abetting thereof, by the Individual Defendants.  Polycom is named as a nominal defendant solely in a derivative capacity.

69.     Plaintiff will adequately and fairly represent Polycom's interests in enforcing and prosecuting its rights.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY,
UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS

70.     Plaintiff was a shareholder of Polycom common stock at the time of the wrongdoing of which Plaintiff complains and has been continuously since.

71.     Plaintiff did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

72.     The Board of Polycom currently consists of the following five Director Defendants: Atkins, Kelley, Mercer, Owens, and Parker.

**A.      The Director Defendants Face a Substantial Likelihood of Liability**

73.     Director Defendants Atkins, Kelley, Mercer, Owens, and Parker face a substantial likelihood of liability for their individual misconduct.  These defendants were directors throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true.  Moreover, these individual defendants, as directors (and, in some cases, also as audit committee members) owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and care.  Instead, they knowingly and/or with reckless disregard reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

74.     Moreover, they failed to discharge their duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence care.  This authorization of false and/or misleading statements throughout the Relevant Period, failure to correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal auditing and accounting controls were sufficiently robust and effective (and/or were

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY,
UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS

being implemented effectively), and/or failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and the required diligence constitutes a breach of fiduciary duty, for which Defendants Atkins, Kelley, Mercer, Owens, and Parker face a substantial likelihood of liability.

75.     Further, the Director Defendants face a substantial likelihood of liability for wasting corporate assets by awarding Miller unjustifiable compensation and benefits through the Separation Agreement and Release, by allowing or unreasonably failing to prevent or expeditiously discover and stop the payment of improper expense reimbursements to Miller during the Relevant Period, or by causing the Company to incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions. If the Director Defendants were to bring a suit on behalf of Polycom to recover for damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do.  For this reason demand is futile.

**B.     Demand is Futile as to the Audit Committee Defendants**

76.     Defendants Mercer, Kelley, and Parker, as Audit Committee members, were responsible for reviewing and approving quarterly and annual financial statements, earnings press releases, and Polycom's internal controls over financial reporting.  Despite these duties, Defendants Mercer, Kelley, and Parker knowingly and/or recklessly reviewed and approved false financial statements and press releases.  Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon these Defendants therefore is futile.

**C.     Demand is Futile Because the Director Defendants are Not Independent From Miller**

77.     As discussed above, the Director Defendants privately authorized a substantial, unjustified golden parachute separation package for Miller *after* the Director Defendants discovered Miller's improper conduct.  This action demonstrates the Director Defendants' willingness to put the interests of their long-time personal and professional colleague – who admitted to substantially damaging the Company to whom these directors owe fiduciary duties

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS

1   – ahead of the interests of Polycom and its shareholders. Thus, this unjustified action, which

2   was not a valid exercise of business judgment, raises a reasonable doubt as to these Director

3   Defendants' ability to independently consider a demand to initiate litigation against Miller.

4   For this additional reason, demand is futile.

5           **D.      Demand is Futile as to All Directors for Additional Reasons**

6           78.      If Polycom's current officers and directors are protected against personal

7   liability for their acts of mismanagement, abuse of control, and breaches of fiduciary duties

8   alleged in this Complaint by D&O Insurance, they caused the Company to purchase that

9   insurance for their protection with corporate funds, *i.e.*, monies belonging to the

10  shareholders. However, Plaintiff is informed and believes that the D&O Insurance policies

11  covering the Individual Defendants in this case contain provisions that eliminate coverage for

12  any action brought directly by Polycom against the Individual Defendants, known as the

13  "insured versus insured exclusion." As a result, if the Director Defendants were to sue

14  themselves or certain of the officers of Polycom, there would be no D&O Insurance protection,

15  and thus, this is a further reason why they will not bring such a suit. On the other hand, if the

16  suit is brought derivatively, as this action is brought, such insurance coverage exists and will

17  provide a basis for the Company to effectuate recovery. Therefore, the Director Defendants

18  cannot be expected to file the claims asserted in this derivative lawsuit because such claims

19  would not be covered under the Company's D&O insurance policy.

20          79.      Under the factual circumstances described herein, the Individual Defendants are

21  more interested in protecting themselves than they are in protecting Polycom by prosecuting

22  this action. Therefore, demand on Polycom and its Board is futile and is excused.

23          80.      Polycom has been and will continue to be exposed to significant losses due to

24  the Individual Defendants' wrongdoing. Yet, the Director Defendants have not filed any

25  lawsuits against themselves or others who were responsible for the wrongful conduct. Thus,

26  the Director Defendants are breaching their fiduciary duties to the Company and face a

27  sufficiently substantial likelihood of liability for their breaches, rendering any demand upon

28  them futile.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY,
UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS

81.    A true and correct copy of this complaint was delivered to Polycom prior to being filed with this Court.

## COUNT I

### Against The Individual Defendants for Breach of Fiduciary Duty

82.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

83.    The Individual Defendants owed and owe Polycom fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Polycom the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

84.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

85.    The Individual Defendants each knowingly, recklessly or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

86.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Polycom has sustained significant damages.  As a result of the misconduct alleged herein, these Defendants are liable to the Company.

87.    Plaintiff, on behalf of Polycom, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

88.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

89.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Polycom.

90.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Polycom.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS

91.     Plaintiff, as a shareholder and representative of Polycom, seeks restitution from these Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by these Defendants from their wrongful conduct and fiduciary breaches.

92.     Plaintiff, on behalf of Polycom, has no adequate remedy at law.

**COUNT III**

**Against the Individual Defendants for Corporate Waste**

93.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

94.     The wrongful conduct alleged regarding the issuance of false and misleading statements, was continuous, connected, and was on-going throughout the applicable time period.  It resulted in continuous, connected, and on-going harm to the Company.

95.     As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) authorizing, approving or allowing the payment of excessive compensation, bonuses, benefits and termination payments to Miller; (ii) by allowing or unreasonably failing to prevent or expeditiously discover and stop the payment of improper expense reimbursements to Miller during the Relevant Period; and (iii) causing the Company to incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

96.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

97.     Plaintiff, on behalf of Polycom, has no adequate remedy at law.

**X.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' violations of federal securities laws, breaches of fiduciary duties, and unjust enrichment;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY,
UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS

B.      Directing Polycom to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Polycom and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to permit the shareholders of Polycom to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of Polycom's directors, executives and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters; and

- a provision to appropriately test and then strengthen the internal audit and control functions;

C.      Awarding to Polycom restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

/ / /

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY,
UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS

1   **XI.    JURY DEMAND**

2           Plaintiff demands a trial by jury.

3

4

5   Dated: August 21, 2013                                JOHNSON & WEAVER, LLP
                                                           FRANK J. JOHNSON
6                                                          SHAWN E. FIELDS

7

8                                          By:_____/s/ Frank J. Johnson_____
                                                        FRANK J. JOHNSON
9

10                                              110 West "A" Street, Suite 750
                                                San Diego, CA  92101
11                                              Telephone: (619) 230-0063
                                                Facsimile: (619) 255-1856
12                                              frankj@johnsonandweaver.com
                                                shawnf@johnsonandweaver.com

13                                              *Attorneys for Plaintiff*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY,
UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS