1   JOHNSON & WEAVER, LLP
    Frank J. Johnson (SBN 174882)
2   frankj@johnsonandweaver.com
    Shawn E. Fields (SBN 255267)
3   shawnf@johnsonandweaver.com
    110 West "A" Street, Suite 750
4   San Diego, CA 92101
    Telephone: (619) 230-0063
5   Facsimile: (619) 255-1856

6   *Lead Counsel for Plaintiffs*

7

8                  **UNITED STATE DISTRICT COURT**

9                **NORTHERN DISTRICT OF CALIFORNIA**

10

11  IN RE POLYCOM, INC. DERIVATIVE          Lead Case No.: 3:13-cv-03880-SC
    LITIGATION
12                                          (Derivative Action)

13  This Document Relates To:               VERIFIED CONSOLIDATED FIRST
                                            AMENDED SHAREHOLDER DERIVATIVE
14      ALL ACTIONS.                        COMPLAINT FOR BREACH OF
                                            FIDUCIARY DUTY, UNJUST
15                                          ENRICHMENT, AND WASTE OF
                                            CORPORATE ASSETS
16

17                                          DEMAND FOR JURY TRIAL

18

19

20

21

22

23

24

25

26

27

28

    VERIFIED CONSOLIDATED FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

By and through their undersigned counsel, Plaintiffs Ralph Saraceni and James Donnelly ("Plaintiffs") bring this consolidated shareholder derivative action on behalf of Polycom, Inc. ("Polycom" or the "Company") and against certain current and former officers and directors of the Company for breaches of fiduciary duties, unjust enrichment, and waste of corporate assets.   Plaintiffs make these allegations upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, which includes, without limitation: a) review and analysis of public filings made by Polycom and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; c) review of news articles, shareholder communications, postings on Polycom's website concerning the Company's public statements; d) review of other publicly available information concerning Polycom and the Individual Defendants (defined herein); and e) interviews with a former Polycom employee confidential witness ("CW") with direct knowledge of the misconduct alleged herein.

## I.   INTRODUCTION

1.   Nominal Defendant Polycom is a San Jose-based provider of unified communications ("UC") solutions and a provider of telepresence, video, voice, and infrastructure solutions based on open standards.

2.   Defendant Andrew Miller ("Miller") joined Polycom as an Executive Vice President of Global Field Operations on July 1, 2009.  According to the Company press release announcing his hire, Miller "had a great and frankly unique on the planet background to come into Polycom into that EVC Global Field Ops role."  As a result of this "unique" skill set, the Individual Defendants authorized Miller to enact wholesale changes at the Company, including forcing 42% turnover in Polycom's sales team in just one year.  On May 10, 2010, the Board promoted Miller to CEO, where he continued to enact breakneck wholesale changes at Polycom with essentially carte blanche approval from the Board, including replacing six senior executives in a single day.

VERIFIED CONSOLIDATED FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

3.      Unbeknownst to investors, from approximately May 2010 through July 23, 2013 (the "Relevant Period"), Miller submitted numerous false expense reports, claiming personal expenses as business expenses. According to CW, a former Polycom insider with direct knowledge of the facts alleged, Miller regularly submitted expenses for reimbursement as business expenses even when they clearly were personal expenses. As set forth more fully below, Miller submitted millions of dollars of receipts for such lavish personal expenditures as spa packages for himself and his family, personal family trips, five-figure dinner tabs with no business connection, and cashmere sweaters and ties costing hundreds of dollars each.

4.      On July 23, 2013, the Individual Defendants caused the Company to shock investors when it announced that Miller resigned as CEO and a director "after the Audit Committee of the Board of Directors found irregularities in [his] expense submissions." Miller "accepted responsibility" for his transgressions. The Company's review of Miller's expenses is ongoing, "including for the years ended December 31, 2010, 2011, and 2012." This acknowledgement of responsibility came after the Individual Defendants caused Polycom to disclose that Polycom's Audit Committee, on July 17, 2013, had "***completed*** a review of certain of Mr. Miller's expense submissions" and found "certain irregularities in these submissions." (Emphasis added.) Further, the Individual Defendants caused Polycom to represent, "[a]t ***the conclusion of the review***, Mr. Miller accepted responsibility" and submitted a letter of resignation. Polycom's newly-appointed interim CEO, defendant Kevin T. Parker ("Parker"), expressed his "disappointment" in Miller's having to tender his resignation under these circumstances.

5.      On this news, the price of Polycom stock declined by 15%, closing at $9.49 per share on July 24, 2013, down $1.69 per share on unusually high trading volume.

6.      Indicating the seriousness not only of Miller's "transgressions," but also of Polycom's Board's failure to adequately oversee the Company's internal oversight processes, the Securities & Exchange Commission ("SEC") informed the Board in July 2013, that it had commenced an investigation ***into the Audit Committee's review of Miller's expenses and his resignation***. Despite being informed of this fact in July 2013, and having ample opportunity

1    to disclose this fact to investors, the Board did not disclose the SEC investigation until

2    September 21, 2013.   To date, Polycom has spent over $3 million in connection with the

3    investigation.

4        7.    Throughout the Relevant Period, the Individual Defendants issued or authorized

5    the issuance of materially false and misleading statements regarding the Company's controls

6    and business practices, and failed to discharge their fiduciary duties of due diligence and

7    reasonable care by failing to take reasonable steps to implement and ensure compliance with

8    adequate internal controls governing the Company's expense reimbursement policies and

9    procedures.   Specifically, the Individual Defendants failed to disclose that the Company

10   maintained inadequate controls to prevent its officers from submitting improper expense

11   reimbursements and that Miller was in fact submitting improper reimbursement requests.   As a

12   result of these materially misleading statements, Polycom stock traded at artificially inflated

13   prices during the Relevant Period.

14       8.    The true facts, which were known or recklessly disregarded by the Individual

15   Defendants but concealed from the investing public during the Relevant Period, were as

16   follows:

17       a)  Polycom's CEO was submitting improper expense reimbursements;

18       b)  Polycom's internal controls were inadequate to prevent its officers and
19           executives from submitting improper reimbursement requests; and

20       c)  The Individual Defendants had failed to discharge their fiduciary duties of
21           due diligence and reasonable care by failing to take reasonable steps to
22           implement or ensure compliance with adequate expense reimbursement
23           policies and procedures.

24       9.    Because of the Individual Defendants' materially misleading statements and

25   failure to maintain adequate internal controls, Polycom stock traded at inflated levels during

26   the Relevant Period.   However, after the above revelations seeped into the market, the price of

27   Polycom stock was hammered by massive sales, sending it down 15% in just one day of high-

28   volume training.

10.     Moreover, on the eve of the Company publicly announcing that Miller had accepted responsibility for submitting improper expense reimbursement requests, and announcing that Miller had submitted his resignation related to this misconduct, upon information and belief, with the authorization, knowledge and approval of the Individual Defendants, Miller entered into a "Separation Agreement and Release" with Polycom, under which Miller was promised a $500,000 cash payment, assured continued eligibility for a bonus for the first half of 2013, promised a year's reimbursement (through another cash payment) of COBRA expenses, and allowed to keep expensive company computer and mobile telecommunications equipment. Miller as also allowed to remain a Polycom "employee" through August 15, 2013, and to continue to receive his normal base salary (while simultaneously agreeing that he "would not report to work" and that his email and network access would terminate upon public announcement of his resignation). Miller was allowed to remain an "employee" until August 15, 2013, so that he could be awarded yet more compensation, in the form of 50,000 shares of Company stock through a Restricted Stock Unit Award, and potentially as much as an additional 75,000 shares of Company stock through a Performance Share Award. Both "awards" were unvested as of the date of Miller's resignation, but would vest before Miller's last day as an "employee."

11.     Further, at the time the Separation Agreement and Release was executed, Polycom's investigation into the full extent, scope, and financial impact of Miller's misconduct had not even been completed, but was still ongoing. Nonetheless, the Individual Defendants caused Polycom to agree to the Separation Agreement and Release – without Polycom having completed its investigation, and thus without Polycom having known the true extent, scope, and financial impact of Miller's misconduct.

12.     Additionally, when Polycom disclosed the terms of the Separation Agreement and Release to the investing public, the Individual Defendants failed to cause Polycom to disclose that the Company's review of Miller's improprieties was still ongoing. Instead, the Individual Defendants caused Polycom to paint a wholly different picture – one that was false or, at best, materially misleading to the public, representing that Polycom's Audit Committee

had "completed" a review of Miller's expenses on July 17, 2013, and "[u]pon conclusion of that review," Miller accepted responsibility and submitted his resignation.

13.     Thereafter, on or about September 11, 2013, the Individual Defendants caused Polycom to file a Form 8-K with the SEC, admitting for the first time that, at the time when the Separation Agreement and Release was executed, the Company had not in fact completed its review of Miller's misconduct.  Nor had Miller accepted responsibility and tendered his resignation "at the conclusion of" the Company's review.  Instead, Polycom admitted, the Company's investigation had continued and uncovered even more improprieties by Miller, including as far back as 2010.  In other words, Polycom admitted, Miller had apparently been submitting improper expense reports for nearly all, if not all, of his three-plus years as the Company's CEO.  Further, the Individual Defendants caused Polycom to announce, "[t]he SEC has commenced an investigation concerning the Audit Committee's review of Mr. Miller's expenses and his resignation, and it has requested information from us.  We are cooperating with the investigation."

14.     The Polycom Board of Directors ("Board") has not, and will not commence litigation against the Individual Defendants — *i.e.*, themselves, let alone vigorously prosecute such claims, because the Individual Defendants face a substantial likelihood of liability to Polycom for authorizing or failing to correct the false and misleading statements alleged herein, for failing to discharge their fiduciary duties of due diligence and reasonable care by failing to take reasonable steps to implement and ensure compliance with adequate expense reimbursement policies and procedures, and for breaching their fiduciary duties of loyalty by approving or failing to prevent the Company's grant of a golden parachute to Miller despite the fact that the Company was still investigating and uncovering additional wrongdoing by Miller.  Accordingly, a pre-suit demand upon the Polycom Board is a useless and futile act. Thus, Plaintiffs rightfully bring this action to vindicate Polycom's rights against its wayward fiduciaries and hold them responsible for the damages they have caused Polycom.

## II.    JURISDICTION AND VENUE

15.    This Court has jurisdiction over Defendants pursuant to 28 U.S.C. §1331, as Plaintiffs' claims arise in part out of the laws of the United States, including §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. All of Plaintiffs' claims arising under the Exchange Act are within the exclusive jurisdiction of this Court. This Court also has jurisdiction over all claims under 28 U.S.C. §1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.    Venue is proper in this Court because Polycom's principal executive offices are located at 6001 America Center Dr., San Jose, CA 95002, where the day-to-day operations of the Company are directed and managed. Moreover, Plaintiffs' claims arose in this District, Plaintiffs have suffered and will continue to suffer harm in this District, and each Defendant has extensive contact with California.

## III.    THE PARTIES

17.    Plaintiff Ralph Saraceni first purchased Polycom common stock in or about 2001, and has continuously held his Polycom stock ever since. Saraceni is a citizen of Massachusetts.

18.    Plaintiff James Donnelly first purchased Polycom common stock in or about June 2013, and has continuously held his Polycom stock ever since. Donnelly is a citizen of North Carolina.

19.    Nominal Defendant Polycom is a Delaware corporation with its principal place of business located at 6001 America Center Dr., San Jose, CA 95002.

20.    Defendant Miller was, at all times during the Relevant Period, Polycom's President, CEO, and a director until his resignation on or about July 19, 2013. Miller became the Company's CEO on or about May 10, 2010. Before becoming CEO, Miller was an Executive Vice President of Global Field Operations for Polycom, having joined Polycom in

that capacity in 2009.  Upon information and belief, Miller is a citizen of South Carolina and Florida.

21.    Defendant Betsy S. Atkins ("Atkins") is a director of the Company, member of the Corporate Governance & Nominating Committee, and Chair of the Compensation Committee.  Upon information and belief, Atkins is a citizen of Florida.

22.    Defendant John A. Kelley ("Kelley") is a director of the Company, member of the Audit Committee, and Chair of the Corporate Governance & Nominating Committee.  Upon information and belief, Kelley is a citizen of Colorado.

23.    Defendant D. Scott Mercer ("Mercer") is a director of the Company, a member of the Corporate Governance & Nominating Committee, and Chair of the Audit Committee.  Upon information and belief, Mercer is a citizen of California.

24.    Defendant Parker is a director of the Company.  During the Relevant Period, Parker was also a member of the Company's Audit Committee.  Parker was named interim-CEO after Miller announced his resignation.  Upon information and belief, Parker is a citizen of Virginia and Utah.

25.    Defendant William A. Owens ("Owens") is a director of the Company and member of the Compensation Committee.  While not a member of the Audit Committee during the Relevant Period, Owens was named to the Audit Committee (as Parker's replacement) after Miller's resignation was announced and Parker became interim CEO.  Upon information and belief, Owens is a citizen of California and Washington.

26.    Defendants Atkins, Kelley, Mercer, Owens, and Parker are all current Board members and are collectively referred to as the "Board" or the "Director Defendants."

27.    Defendants Kelley, Mercer, and Parker are sometimes collectively referred to herein as the "Audit Committee Defendants."

28.    Defendants Miller, Atkins, Kelley, Mercer, Parker, and Owens are sometimes collectively referred to herein as the "Individual Defendants."

## IV.  SUBSTANTIVE ALLEGATIONS

### A.  Background to the Relevant Period

29.  Polycom was founded in 1990 and is headquartered in San Jose, California.

30.  Polycom is a provider of UC solutions and a provider of telepresence, video, voice, and infrastructure solutions based on open standards.  With Polycom RealPresence video and voice solutions, from infrastructure to endpoints, people all over the world can collaborate face-to-face without being in the same physical location.  The Company has several operating segments: Americas, which consist of North, Central, and Latin Americas; Europe, Middle East, and Africa; and Asia Pacific.  The products and solutions include Network Infrastructure, UC Group Systems and UC Personal Devices, which includes desktop video devices and wireless local area network products.

### B.  Miller Initiates Wholesale Changes at Polycom

31.  Before and during the Relevant Period, the Individual Defendants repeatedly touted Defendant Miller's unique skill set and importance to the continuing success of Polycom.  As such, the Individual Defendants gave carte blanche to Miller to enact dramatic wholesale reforms at the Company, including creating new divisions and collaborations, forcing significant turnover within the sales force, and radically shaking up the Company's senior executive leadership.  Having been given so much authority by the Individual Defendants, Miller abused this power by fleecing Polycom for his own personal use; having rested so much of Polycom's success in Miller, the Individual Defendants knowingly or recklessly allowed this improper behavior to continue.

32.  Miller joined Polycom on July 1, 2009, as Executive Vice President of Global Field Operations.  Polycom's then-Chief Financial Officer described Miller's hiring as "a very important addition" to the Company, given his extensive background and uniquely superior go-to-market skills.  *See* Piper Jaffray Technology, Media & Telecommunications Conference, 11/9/2010.  Miller spent 11 years at Cisco and held a number of senior key sales and go-to-market roles.  After Cisco, Miller was the CEO of Polycom's "archrival," Tandberg.  Miller "had a great and frankly unique on the planet, background to come into Polycom into that

EVC Global Field Ops role." As Polycom's CFO explained, "a lot of the benefits that [investors] [are] seeing in [Polycom's] execution, a lot of the improvements in execution really began when [Miller] came on board in July of 2009…there have been a lot of great things that have happened since May of 2010, because in May of 2010, we promoted him to CEO." Miller "grew up in [the] go-to-market — he was a salesman and worked his way up into the senior rates of go-to-market management….So [Polycom] ha[s] a very go-to-market savvy CEO that is out there working with the sales team, and the customers themselves, and the prospects, and the partners, almost perpetually — I mean, personally he is on the road, out of 90, 95% of the time meeting with customers and partners."

33. In his initial role as Executive Vice President of Global Field Operations, Miller strategized, directed and implemented Polycom's aggressive shift to a go-to-market approach. In fact, Miller was brought in "to take over [Polycom's] go-to-market organization, take it to the next level." *See* UBS Global Technology and Services Conference, 6/8/2010. As part of that go-to-market transformation, Polycom spent significant resources in additional sales coverage for underserved areas and in building demonstration centers across the world to more effectively compete in the marketplace. Polycom also increased its sales engineering coverage by improving the mix of sales engineers to sales people in order to more effectively market its products. *See* Bank of America Merrill Lynch SMID Cap Conference, 6/9/2010. The Company invested not only in its quota-carrying sales team, but also in the support, training, marketing, infrastructure and facilities areas that supported the success of its sales' team. *See* Cowen and Company Technology Media & Telecom (TMT) Conference, 6/3/2010. As part of incentivizing its sales team, Miller devised a commission-based structure that increased rewards for sales of higher gross-margin products. *See* UBS Global Technology and Services Conference, 6/8/2010; William Blair Growth Stock Conference, 6/5/2010. Miller "lead[ ] that [strategy] effort very successfully." *See* UBS Global Technology and Services Conference, 6/8/2010.

34. In doing the "heavy lifting" of Polycom's transformation, Miller made "significant change[s] with the sales force." *See* Bank of America Merrill Lynch SMID Cap

Conference, 6/9/2010. "[S]ince start[ing] this [transformation] process in October of 2009, [Miller] hired a net addition of 164 individuals in the sales organization, 49 of which were made in Q2. *See* Polycom Q2 Earnings Call, 7/15/2010. Indeed, Miller announced that he "changed out 42% of the sales team which is not for the weak of heart. And [Polycom] did that because Polycom was always a channel-led company. It was not a high touch company like Cisco. We felt — I felt strongly that for us to compete against Cisco and win, it had to be high touch." *See* Sanford C. Bernstein & Co. Strategic Decisions Conference, 6/3/2011. The Company said Miller was "deadly serious about speed and precision [a]nd accountability and performance intensity." *Id.*

35.     Miller also created Polycom's Open Collaboration Network, a key partnership with seven providers: Microsoft, IBM, Juniper, Avaya, Siemens, Broadsoft and HP. *See* Cowen and Company Technology Media & Telecom (TMT) Conference, 6/3/2010. This partnership enabled Polycom to integrate with these critical providers not only from a technology perspective, but also from a go-to-market perspective in order to provide choice for customers, as well as investment protection. Polycom is the only independent open standard-based solution provider that can interface and work within a Microsoft OCS or IBM environment, giving the Company a "huge advantage…in the marketplace." Accordingly, the Polycom Open Collaboration Network was a "key part" of Polycom's strategy. As part of that alliance, Polycom co-founded the Unified Communications Interoperability Forum, designed to make unified communications open and interoperable. *See* UBS Global Technology and Services Conference, 6/8/2010. Polycom's Open Collaboration Network has been driving significant customer wins for the Company. *See* Polycom Q1 2011 Earnings Call, 4/21/2011. For example, 23% of Polycom's revenues in the fourth quarter of 2010 were a direct result of the network. *See* Morgan Stanley Technology, Media & Telecom Conference, 3/1/2011.

36.     Polycom consistently acknowledged Miller's contributions to the Company's success: Miller "has brought with him over the last almost a year now strong customer-centric approach, very much focus on partners, very much a focus on meeting the demand that is now in front of us and I know one of the things that Andy is very focused on is augmenting what

has been a technology and product centricity and adding that customer centricity to it." *See* JMP Securities Research Conference, 5/10/2010.  Miller was considered the "primary architect" of Polycom's go-to-market initiative, a "big deal," a "big investment." *See* Bank of America Merrill Lynch SMID Cap Conference, 5/10/2010.  Miller "came in and he was a key driver of that strategic investment model that we developed and the execution plan.  If you look at those initiatives, he was…leading the preponderance of the heavy lifting there.  The go-to-market build out by definition, that was his job.  The strategic partnership, absolutely…So as far as the strategy and the financial commitments, 100% in line…this isn't a third-party individual coming in…[h]e is just the opposite.  Very much involved in driving it before and is involved completely now as CEO in driving the plan…So I think you see it in the go-to-market transformation, it's exciting, people love it.  The channels like what they're seeing, the sales force likes what they're seeing, now with him in the bigger job, the whole company likes it."  It was culturally a huge shift." *See* Wells Fargo Securities Technology, Media & Telecom (TMT) Conference, 11/10/2010.  In short, from a go-to-market standpoint, Miller's addition was "really nothing [short] of transformative."

37.     Miller "more effectively aligned [Polycom's] resources by geography, vertical market and strategic alliance…and…also continued to shift [its] mix of sales staff, from six quota-bearing salespeople per sales engineering just nine months ago, to 2.2 quota-bearing salespeople per sales engineer.  That ratio and this improvement is now enabling Polycom to both capture our wallet share, as well as deepen the relationships with [the Company's] customers and IT organizations." *See* Polycom Q2 2010 Earnings Call, 7/15/2010.  As a result, Polycom is "achieving a stronger ramp in sales productivity that is well ahead of plan."

38.     Thus, having "been leading that [go-to-market] effort very successfully," Miller was "promoted to the CEO position." *See* UBS Global Technology and Services Conference, 6/8/2010.  Immediately after this elevation, Miller announced that he "decided to structure [Polycom's] go-to-market leadership team as direct reports to [him]…mean[ing] that [the Company's] theater presidents for the Americas, EMEA and Asia-Pacific are now on the executive staff team and [Miller] will be more directly involved with each of [Polycom's]

11

theater presence operations.  *See* Polycom Q2 2010 Earnings Call, 7/15/2010.  "In concert with this organizational approach, you'll see me take a very active role as CEO with the executives for our strategic partners, channel partners, and customers around the world," Miller said.

39.     As CEO of Polycom, Miller made "significant management changes" at Polycom, bringing in six world-leading executives one at a time, comprising an entirely new executive management team.  *See* Piper Jaffray Technology, Media & Telecommunications Conference, 11/9/2010.  Miller told the investors that he "simultaneously…hired six of the best executives on the market to help drive Polycom to its next $1 billion revenue growth opportunity:" (i) Sudhakar Ramakrishna, with a "stellar reputation and career" at Motorola, where he ran the Mobility and Wireless Group, joined Polycom as the General Manager of Products, Engineering, Services and Operations, as well as Chief Development Officer; (ii) Joe Burton, former Chief Technology Officer for Unified Communications at Cisco, joined Polycom to help drive its strategy and technology; (iii) Sue Hayden, former Vice President at Oracle Corporation, became Polycom's Executive Vice President and General Manager of the Company's line of business; (iv) Alan Rudolph, with a former "stellar career" at ACS and Xerox, was hired as Polycom's SVP of Services; (v) Gary Rider, who previously ran one of the largest segments at NCR, joined Polycom as the President of Europe, Middle East, and Africa; and (vi) Ashley Goldsmith, who became Polycom's Senior Vice President of Human Resources.  *See* Polycom Analyst and Investor Meeting, 12/6/2010.

40.     As Miller himself acknowledged, when he "came on board as CEO, [the Company] made a complete change up in the executive team.  [The Company] hired six new executives simultaneously.  And [the Company] did that because [Miller] felt in order to initiate all the changes….  [Polycom] needed a different set of executives to drive [it] to the next level."  *See* Sanford C. Bernstein & Co. Strategic Decisions Conference, 6/3/2011. Through the "significant" shift to a go-to-market approach and the changeover in the executive team, the Company was "able to, for the first time in Polycom's history, put together seven quarters of sequential growth."  "But I would never want to do what I did last year again, and stability and momentum are key now," said Miller.

41.     As explained by Polycom's then-CFO, that kind of executive reshuffling is remarkably rare:

> But what [Miller] has done and with the legacy management team, has made some significant changes and I won't go in depth into each one of these names, but we've brought on a really top notch management team into this company and this was just a couple of months ago.   We actually announced all six of these in one day, something that I'm not sure I've ever seen before, but it was a significant shift in, and additions to our management.

\* \* \*

> We had brought in a new go-to-market organization under the leadership of Andy Miller as our EVP of Global Field Operations back in July 2009, and in May we made him the CEO of the company. And with that, we made some significant management additions to the company later in the year. We actually, on a single day, announced six new executives on the executive team. Something that is rarely seen, but in fact, we brought in some very high-powered additions to the team…

*See* Barclays Capital Global Conference, 12/8/2010; Morgan Stanley Technology, Media & Telecom Conference, 3/11/2011.

### C.     Miller Submits Improper and Falsified Expense Reports

42.     Throughout Miller's tenure as CEO, he took advantage of his position of power and the blank check to restructure the Company by fleecing Polycom out of millions of dollars by submitting improper and falsified expense reports for reimbursement of clearly personal expenses.

43.     A former insider at Polycom confirmed this fact, which was well known throughout the Company.  According to CW, Polycom had a tightly-monitored expense report approval process that easily would have uncovered Miller's blatant and audacious conduct. CW worked as a Commissions Analyst at Polycom from June 2009 until November 2011, during which time he/she reported to Jill Merken, Vice President of Global Sales.  Beginning in June 2010, shortly after Miller's appointment as CEO, CW began reviewing Miller's expense receipts and preparing Miller's expense reports for approval.   CW continued preparing Miller's expense reports until he/she was terminated in November 2011 shortly after Miller was told that CW refused to submit his expense reports for clearly personal expenses.

44.     CW explained that Miller regularly submitted for reimbursement receipts for personal expenses that had no possible business purpose.  These personal expenses included:

- Multiple spa gift certificates for Miller and his family
- Thousands of dollars to fly in fresh crab and lobster for personal parties
- Thousands of dollars in receipts for expenses related to personal parties at Miller's home, including dozens of lavish gift baskets for a private Christmas party Miller gave away to friends
- Dry cleaning expenses
- Flights and hotels for trips to San Diego, California, for the sole purpose of receiving healthcare treatment for Miller and one of his children
- Expensive doctor visits and prescriptions for one of Miller's children
- Massages for himself and friends at five star hotels
- Hotel rooms and expensive movie charges for Miller's children, who occasionally traveled with Miller to conferences
- Personal golf trips and outings
- Birthday cakes for his children
- Thousands of dollars in connection with at least one trip to China that had not business purpose

45.     While these clearly personal expenses had no business connection whatsoever, three particularly egregious types of receipt submissions by Miller stood out for CW.  First, Miller would regularly submit dinner receipts for thousands of dollars with no explanation for the dinner's connection to Polycom.  When CW would ask for an explanation (which was required with any business-related expense submission), or at least a list of people who attended the dinner (which was also required), Miller would only respond by saying that "he took out the whole sales force for dinner as a thank you."  Miller routinely provided this vague justification for five-figure dinner receipts, even though this was verifiably false.  CW explained that on at least two occasions Miller used this excuse for expensive dinners overseas

even when no members of Polycom's sales team were with him and he was nowhere near any Polycom overseas locations.

46.    Second, Miller regularly submitted receipts for thousands of dollars in expensive clothing.  CW recounted that Miller submitted one receipt where it appeared he "bought every color of every cashmere sweater" at a particular department store.  Miller also regularly purchased ties that cost "several hundred dollars."

47.    Third, CW explained that Miller submitted a receipt for "a new gadget" such as a smartphone, tablet, laptop, or other device "after nearly every business trip" with the explanation that the device was a replacement for one Miller "left on the plane."  CW estimates that these expenses alone topped $35,000 in the year that he/she prepared Miller's expense reports.

48.    CW explained that he/she immediately recognized that these expenses should not be included for reimbursement in the expense reports he/she submitted for approval. However, anytime he/she raised a concern about the expenses to his/her superiors, CW was told not to question anything because Miller could get him/her fired.  Under pressure, CW prepared most of the requested expense reports, but took great pains to provide sufficient detail of the expenses to let accounting, the Controller, and the CFO know that the expenses were clearly personal and should not be approved.  CW also explained that Miller's improper expenditures were "common knowledge" throughout the Company.  CW said that most of Polycom's "executive assistants knew" and that multiple senior members of the accounting department said they "were glad when they found out I was doing the expense reports because I knew they were out of line and everyone at Polycom was nervous he [Miller] would get caught."

49.    This knowledge reached the highest levels of senior management.  CW explained that he/she once had a conversation with Laura Durr, who served as Polycom's Controller during CW's employment and who was appointed Interim Chief Financial Officer by the Director Defendants on March 14, 2014, about various business issues, including what Durr called Miller's "unusual expense reports."

**D.    Polycom's Code of Business Ethics and Conduct**

50.    In its 2010 Proxy Statement, the Individual Defendants caused the Company to describe its business ethics practice as follows:

**Corporate Governance Principles and Code of Business Ethics and Conduct**

Polycom believes that strong corporate governance practices are the foundation of a successful, well-run company. ***Polycom is committed to establishing an operating framework that exercises appropriate oversight of responsibilities at all levels throughout Polycom and managing its affairs consistent with high principles of business ethics.*** The Board of Directors has adopted Corporate Governance Principles that set forth our principal corporate governance policies, including the oversight role of the Board of Directors. The Board of Directors first adopted these Corporate Governance Principles in 2003 and has refined them from time to time. The Corporate Governance Principles are available on Polycom's website at *www.polycom.com/company/investor_relations/corporate_governance*.

In addition, Polycom has adopted a Code of Business Ethics and Conduct, which is applicable to our directors and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions. The Code of Business Ethics and Conduct is available on Polycom's website at *www.polycom.com/company/investor_relations/corporate_governance*. Polycom will disclose on its website any amendment to the Code of Business Ethics and Conduct, as well as any waivers of the Code of Business Ethics and Conduct that are required to be disclosed by the rules of the SEC or The NASDAQ Stock Market LLC ("NASDAQ") (emphasis added).

51.    Similarly, the Individual Defendants caused the Company to describe its business ethics identically, or substantially identically, in the Company's 2011, 2012, and 2013 Proxy Statements.

52.    Polycom's Code of Business Ethics and Conduct posted on Polycom's web site as of December 31, 2010 stated the following regarding use of Polycom funds and expense submissions:

**(iii) Polycom Funds**

Polycom funds must be used *only* for Polycom business purposes. Every Polycom employee, agent and contractor must take reasonable steps to ensure that Polycom receives good value for Polycom funds spent, and must maintain accurate and timely records of each and every expenditure. Expense reports must be accurate and submitted in a timely manner. Polycom employees, agents and contractors must not use Polycom funds for any personal purpose. Polycom agents or contractors are not allowed to exercise control over Polycom funds.

53.    Likewise, the Code of Business Ethics and Conduct posted on Polycom's web site as of December 2012 stated:

16

### (iii) Polycom Funds

***Polycom funds must be used only for Polycom business purposes.***
Every Polycom employee, agent and contractor must take reasonable steps to ensure that Polycom received good value for Polycom funds spent, and must maintain accurate and timely records of each and every expenditure.   Expense reports must be accurate and submitted in a timely manner.   Polycom employees, agents and contractors must not use Polycom funds for any personal purpose.   Polycom agents or contractors are not allowed to exercise control over Polycom funds.

54.     Upon information and belief, Polycom's policies and mandates in its Code of Business Ethics and Conduct regarding use of Polycom funds, including the mandate to "maintain accurate and timely records of each and every expenditure," and the mandate that Polycom employees –including the Company's officers – "must not use Polycom funds for any personal purpose," remained the same, or materially the same, throughout the entire Relevant Period, and throughout Miller's entire tenure as CEO of the Company.

### E.     The Individual Defendants Cause Polycom to Issue Materially Misleading Statements

55.     On or about May 10, 2010, Polycom announced that Miller had been named the Company's CEO.   On or about June 9, 2010, Polycom announced that Miller has been appointed to the Board.

56.     On July 15, 2010, the Individual Defendants caused Polycom to issue a press release announcing its second quarter 2010 financial results.   The Company reported total operating expenses of $154 million for the second quarter, including general administrative expenses of $20 million.   The Company also reported net income of $13 million, or $0.14 diluted earnings per share ("EPS"), and net revenues of $295 million for the second quarter ended June 30, 2010.

57.     On July 30, 2010, the Individual Defendants caused Polycom to file its Form 10-Q with the SEC for its second quarter ended June 30, 2010.   The Form 10-Q reported the same financial results for the Company's second quarter ended June 30, 2010 as reported in the Company's July 15, 2010 press release.   The Form 10-Q also included a certification by Miller, which stated:

I, Andrew M. Miller, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Polycom, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

VERIFIED CONSOLIDATED FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

58.   On October 21, 2010, the Individual Defendants caused Polycom to issue a press release announcing its third quarter 2010 financial results.  The Company reported total operating expenses of $159 million for the second quarter, including general administrative expenses of $19 million.  The Company also reported net income of $17 million, or $0.20 diluted EPS, and net revenues of $308 million for the third quarter ended September 30, 2010.

59.   On November 2, 2010, the Individual Defendants caused Polycom to file its Form 10-Q with the SEC for the third quarter ended September 30, 2010.  The Form 10-Q reported the same financial results for the Company's third quarter ended September 30, 2010 as reported in the Company's October 21, 2010 press release.  The Form 10-Q also included a certification by Miller in the same, or substantially the same, form as set forth above in paragraph 59.

60.   On January 20, 2011, the Individual Defendants caused Polycom to issue a press release announcing its fourth quarter and fiscal year ended December 31, 2010 financial results.  The Company reported total operating expenses of $167 million for the fourth quarter, including general administrative expenses of $19 million, and reported total operating expenses of $626 million for the 2010 fiscal year, including general and administrative expenses of $75 million.  The Company also reported net income of $33 million, or $0.37 diluted EPS, and net revenues of $340 million for the fourth quarter ended December 31, 2010.  Further, the Company reported net income of $68 million, or $0.78 diluted EPS, and net revenues of $1.2 billion for the fiscal year ended December 31, 2010.

61.   On February 18, 2011, the Individual Defendants caused Polycom to file its Form 10-K with the SEC for its fiscal year ended December 31, 2010.  The Form 10-K included a certification by Miller in the same, or substantially the same, form as set forth

above in paragraph 59, and further reported the same year-end financial results reported in the Company's January 20, 2011 press release.

62. In addition, the Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by the Individual Defendants, stating that the financial information contained in the Form 10-K was accurate and that it disclosed any material changes to the Company's financial reporting. Defendants Miller and Kourey also signed and approved the internal control report which is based on all of the financial statements for the year ending December 31, 2010. The Report stated in part:

> We conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the results of this evaluation, management has concluded that, as of December 31, 2010 our internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

63. The Form 10-K further stated in part:

> **Evaluation of disclosure controls and procedures**
>
> Our management evaluated, with the participation of our Chief Executive Officer and our Chief Financial Officer, the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Annual Report on Form 10-K. Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures are effective at a reasonable level of assurance to ensure that information we are required to disclose in reports that we file or submit under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and (ii) is accumulated and communicated to Polycom's management, including our Chief Executive Officer and our Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. Our disclosure controls and procedures include components of our internal control over financial reporting. Management's assessment of the effectiveness of our internal control over financial reporting is expressed at the level of reasonable assurance because a control system, no matter how well designed and operated, can provide only reasonable, but not absolute, assurance that the control system's objectives will be met.

64. The 10-K reported total operating expenses for the year ended 2010 of $626 million, including general and administrative expenses of $75 million. The 10-K also announced that in September 2010, the Company hired six new executives and warned that

Polycom's success will depend on its ability to retain its highly qualified senior executives. The 10-K concealed that Miller, the key player at Polycom, falsified his expense reports thereby severely endangering his ability to remain at the helm:

> Our future success will depend in part on our continued ability to hire, assimilate and retain highly qualified senior executives and other key management personnel. For example, in September 2010, we announced the hiring of six new executives with responsibilities including strategy, technology, products, development, EMEA sales and marketing, global services and human resources and we continue to search for a worldwide sales leader. As these new executives assess their areas of responsibilities and define their organizations, it will likely result in additional organizational changes or restructuring actions and charges. Future changes to our executive leadership team, including new executive hires or departures, or other organizational changes implemented by our executive leadership team, could cause disruption to the business and have an impact on our ability to execute successfully in future periods while these operational areas are in transition. For example, our Chief Marketing officer has recently left the Company. Competition for qualified executive and other management personnel is intense, and we may not be successful in attracting or retaining such personnel, which could harm our business.

65.     The foregoing statements were materially false and misleading because they misrepresented and/or failed to disclose the following:

> (i)      Miller was appropriating Polycom's funds for personal expenses in material amounts;

> (ii)     Miller had been submitted false expenses reports, creating a significant risk that he would be terminated from the Company, thereby jeopardizing the Company's stability and future success;

> (iii)    Miller's false expense reports caused the Individual Defendants to cause Polycom to report false and misleading operating expenses and financial results;

> (iv)     Miller regularly violated Polycom's Code of Business Ethics and Conduct, and was therefore subject to dismissal at all relevant times; and

> (v)      The Individual Defendants did not cause the Company to have effective internal controls over its business and financial operations.

66.     On April 13, 2011, the Individual Defendants caused Polycom to issue its 2011 Form 14(a) Proxy Statement to shareholders, which was published to the SEC website.  This proxy statement contained the following report of the Board's Audit Committee for fiscal year 2010:

**AUDIT COMMITTEE REPORT**

The Audit Committee assists the Board of Directors in fulfilling its responsibilities for oversight of the integrity of Polycom's financial statements, our internal accounting and financial controls, our compliance with legal and regulatory requirements, the organization and performance of our internal audit function and the qualifications, independence and performance of our independent registered public accounting firm.

The management of Polycom is responsible for establishing and maintaining internal controls and for preparing Polycom's consolidated financial statements. The independent registered public accounting firm is responsible for auditing the financial statements.  It is the responsibility of the Audit Committee to oversee these activities.

The Audit Committee has:

• Reviewed and discussed the audited financial statements with Polycom management and with PricewaterhouseCoopers LLP, Polycom's independent registered public accounting firm;

• Discussed with PricewaterhouseCoopers LLP the matters required to be discussed by the Statement on Auditing Standards No. 61, Communications with Audit Committees, as amended, and as adopted by the Public Company Accounting Oversight Board;

• Discussed with Polycom management, Polycom Internal Audit, and PricewaterhouseCoopers LLP the evaluation of Polycom's internal controls and the audit of the effectiveness of Polycom's internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act of 2002; and

• Received the written disclosures and the letter from PricewaterhouseCoopers LLP required by applicable requirements of the Public Company Accounting Oversight Board regarding PricewaterhouseCoopers LLP's communications with the Audit Committee concerning independence and has discussed with PricewaterhouseCoopers LLP their independence.

Based upon these discussions and review, the Audit Committee recommended to the Board of Directors that the audited financial statements be included in Polycom's Annual Report on Form 10-K for the fiscal year ended December 31, 2011 for filing with the U.S. Securities and Exchange Commission.

*Respectfully submitted by the members of the Audit Committee of the Board of Directors*

John A. Kelley
D. Scott Mercer
Kevin T. Parker (Chairman)

VERIFIED CONSOLIDATED FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

67.    On April 21, 2011, the Individual Defendants caused Polycom to issue a press release announcing its first quarter 2011 financial results.    The Company reported total operating expenses for the quarter of $170 million, including general and administrative expenses of $18 million.    The Company also reported net income of $34 million, or $0.38 diluted EPS, and net revenues of $344 million for the first quarter ended March 31, 2011.

68.    On April 28, 2011, the Individual Defendants caused Polycom to file its Form 10-Q with the SEC for the first quarter ended March 31, 2011.    The Form 10-Q reported the same financial results for the Company's first quarter ended March 31, 2011, as reported in the Company's April 21, 2011 press release.    The Form 10-Q also included a certification by Miller in the same, or substantially the same, form as set forth above in paragraph 59.

69.    The 10-Q also announced that in September 2010, the Company hired six new executives and warned that Polycom's success will depend on its ability to retain its highly qualified senior executives.    The 10-Q concealed that Miller, the key player at Polycom, falsified his expense reports thereby severely endangering his ability to remain at the helm:

> Our future success will depend in part on our continued ability to hire, assimilate and retain highly qualified senior executives and other key management personnel. For example, in September 2010, we announced the hiring of six new executives with responsibilities including strategy, technology, products, development, EMEA sales and marketing, global services and human resources and we continue to search for a worldwide sales leader. As these new executives assess their areas of responsibilities and define their organizations, it will likely result in additional organizational changes or restructuring actions and charges. Future changes to our executive leadership team, including new executive hires or departures, or other organizational changes implemented by our executive leadership team, could cause disruption to the business and have an impact on our ability to execute successfully in future periods while these operational areas are in transition. For example, our Chief Marketing officer has recently left the Company. Competition for qualified executive and other management personnel is intense, and we may not be successful in attracting or retaining such personnel, which could harm our business.

70.    On July 21, 2011, the Individual Defendants caused Polycom to issue a press release announcing its second quarter 2011 financial results.    The Company reported total operating expenses of $182 million for the quarter, including general and administrative expenses of $21 million.    The Company also reported net income of $29 million, or $0.16 diluted EPS, and net revenues of $366 million for the second quarter ended June 30, 2011.

71.     On August 2, 2011, the Individual Defendants caused Polycom to file its Form 10-Q with the SEC for the second quarter ended June 30, 2011. The Form 10-Q reported the same financial results for the Company's second quarter ended June 30, 2011, as reported in the Company's August 2, 2011 press release. The Form 10-Q also included a certification by Miller in the same, or substantially the same, form as set forth above in paragraph 59.

72.     The 10-Q also announced that in September 2010, the Company hired six new executives and warned that Polycom's success will depend on its ability to retain its highly qualified senior executives. The 10-Q concealed that Miller, the key player at Polycom, falsified his expense reports thereby severely endangering his ability to remain at the helm:

> Our future success will depend in part on our continued ability to hire, assimilate and retain highly qualified senior executives and other key management personnel. For example, in September 2010, we announced the hiring of six new executives with responsibilities including strategy, technology, products, development, EMEA sales and marketing, global services and human resources and we continue to search for a worldwide sales leader. As these new executives assess their areas of responsibilities and define their organizations, it will likely result in additional organizational changes or restructuring actions and charges. Future changes to our executive leadership team, including new executive hires or departures, or other organizational changes implemented by our executive leadership team, could cause disruption to the business and have an impact on our ability to execute successfully in future periods while these operational areas are in transition. For example, our Chief Marketing officer has recently left the Company. Competition for qualified executive and other management personnel is intense, and we may not be successful in attracting or retaining such personnel, which could harm our business.

73.     On October 19, 2011, the Individual Defendants caused Polycom to issue a press release announcing its third quarter 2011 financial results. The Company reported total operating expenses of $197 million, including general and administrative expenses of $22 million. The Company also reported net income of $24 million, or $0.13 diluted EPS, and net revenues of $379 million for the third quarter ended September 30, 2011.

74.     On October 31, 2011, the Individual Defendants caused Polycom to file its Form 10-Q with the SEC for the third quarter ended September 30, 2011. The Form 10-Q reported the same financial results for the Company's third quarter ended September 30, 2011, as reported in the Company's October 31, 2011 press release. The Form 10-Q also included a

certification by Miller in the same, or substantially the same, form as set forth above in paragraph 59.

75.     The 10-Q also announced that in September 2010, the Company hired six new executives and warned that Polycom's success will depend on its ability to retain its highly qualified senior executives.  The 10-Q concealed that Miller, the key player at Polycom, falsified his expense reports thereby severely endangering his ability to remain at the helm:

> Our future success will depend in part on our continued ability to hire, assimilate and retain highly qualified senior executives and other key management personnel.  For example, in September 2010, we announced the hiring of six new executives with responsibilities including strategy, technology, products, development, EMEA sales and marketing, global services and human resources and we continue to search for a worldwide sales leader. As these new executives assess their areas of responsibilities and define their organizations, it will likely result in additional organizational changes or restructuring actions and charges.  Future changes to our executive leadership team, including new executive hires or departures, or other organizational changes implemented by our executive leadership team, could cause disruption to the business and have an impact on our ability to execute successfully in future periods while these operational areas are in transition.  For example, our Chief Marketing officer has recently left the Company.  Competition for qualified executive and other management personnel is intense, and we may not be successful in attracting or retaining such personnel, which could harm our business.

76.     On January 23, 2012, the Individual Defendants caused Polycom to issue a press release announcing its fourth quarter and fiscal year ended December 31, 2011 financial results.  The Company reported total operating expenses of $200 million for the quarter, including general and administrative expenses of $ 21 million.  The Company also reported net income of $50 million, or $0.28 diluted EPS, and net revenues of $407 million for the fourth quarter ended December 31, 2011.  Further, the company reported net income of $136 million, or $0.75 diluted EPS, and net revenues of $1.5 billion for the fiscal year ended December 31, 2011.

77.     On February 17, 2012, the Individual Defendants caused Polycom to file its Form 10-K with the SEC for its fiscal year ended December 31, 2011.  The Form 10-K included a certification by Miller in the same, or substantially the same, form as set forth above in paragraph 59, and further reported the same year-end financial results reported in the Company's January 23, 2012 press release.

78.     In addition, the Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by the Individual Defendants, stating that the financial information contained in the Form 10-K was accurate and that it disclosed any material changes to the Company's financial reporting.  Defendants Miller and Kourey also signed and approved the internal control report which is based on all of the financial statements for the year ending December 31, 2010.  The Report stated in part:

> We conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.  Based on the results of this evaluation, management has concluded that, as of December 31, 2010 our internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

79.     The Form 10-K further stated in part:

> **Evaluation of disclosure controls and procedures**
>
> Our management evaluated, with the participation of our Chief Executive Officer and our Chief Financial Officer, the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Annual Report on Form 10-K.  Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures are effective at a reasonable level of assurance to ensure that information we are required to disclose in reports that we file or submit under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and (ii) is accumulated and communicated to Polycom's management, including our Chief Executive Officer and our Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.  Our disclosure controls and procedures include components of our internal control over financial reporting.  Management's assessment of the effectiveness of our internal control over financial reporting is expressed at the level of reasonable assurance because a control system, no matter how well designed and operated, can provide only reasonable, but not absolute, assurance that the control system's objectives will be met.

80.     The 10-K reported total operating expenses for the year ended 2010 of $626 million, including general and administrative expenses of $75 million.  The 10-K also announced that in September 2010, the Company hired six new executives and warned that Polycom's success will depend on its ability to retain its highly qualified senior executives.

VERIFIED CONSOLIDATED FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

The 10-K concealed that Miller, the key player at Polycom, falsified his expense reports thereby severely endangering his ability to remain at the helm:

> Our future success will depend in part on our continued ability to hire, assimilate and retain highly qualified senior executives and other key management personnel. For example, in September 2010, we announced the hiring of six new executives with responsibilities including strategy, technology, products, development, EMEA sales and marketing, global services and human resources and we continue to search for a worldwide sales leader. As these new executives assess their areas of responsibilities and define their organizations, it will likely result in additional organizational changes or restructuring actions and charges.  Future changes to our executive leadership team, including new executive hires or departures, or other organizational changes implemented by our executive leadership team, could cause disruption to the business and have an impact on our ability to execute successfully in future periods while these operational areas are in transition.  For example, our Chief Marketing officer has recently left the Company.  Competition for qualified executive and other management personnel is intense, and we may not be successful in attracting or retaining such personnel, which could harm our business.

81.    The foregoing statements were materially false and misleading when made for the reasons set forth in paragraph 67.

82.    On April 9, 2012, the Individual Defendants caused Polycom to issue its 2012 Form 14(a) Proxy Statement to shareholders, which was published to the SEC website.  This proxy statement contained the following report of the Board's Audit Committee for fiscal year 2011:

### AUDIT COMMITTEE REPORT

The Audit Committee assists the Board of Directors in fulfilling its responsibilities for oversight of the integrity of Polycom's financial statements, our internal accounting and financial controls, our compliance with legal and regulatory requirements, the organization and performance of our internal audit function and the qualifications, independence and performance of our independent registered public accounting firm.

The management of Polycom is responsible for establishing and maintaining internal controls and for preparing Polycom's consolidated financial statements. The independent registered public accounting firm is responsible for auditing the financial statements. It is the responsibility of the Audit Committee to oversee these activities.

The Audit Committee has:

- Reviewed and discussed the audited financial statements with Polycom management and with PricewaterhouseCoopers LLP, Polycom's independent registered public accounting firm;

- Discussed with PricewaterhouseCoopers LLP the matters required to be discussed by the Statement on Auditing Standards No. 61, Communications with Audit Committees, as amended, and as adopted by the Public Company Accounting Oversight Board;

- Discussed with Polycom management, Polycom Internal Audit, and PricewaterhouseCoopers LLP the evaluation of Polycom's internal controls and the audit of the effectiveness of Polycom's internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act of 2002; and

- Received the written disclosures and the letter from PricewaterhouseCoopers LLP required by applicable requirements of the Public Company Accounting Oversight Board regarding PricewaterhouseCoopers LLP's communications with the Audit Committee concerning independence and has discussed with PricewaterhouseCoopers LLP their independence.

Based upon these discussions and review, the Audit Committee recommended to the Board of Directors that the audited financial statements be included in Polycom's Annual Report on Form 10-K for the fiscal year ended December 31, 2011 for filing with the U.S. Securities and Exchange Commission.

*Respectfully submitted by the members of the Audit Committee of the Board of Directors*

John A. Kelley
D. Scott Mercer
Kevin T. Parker (Chairman)

83. On April 18, 2012, the Individual Defendants caused Polycom to issue a press release announcing its first quarter 2012 financial results. The Company reported total operating expenses of $196 million, including general and administrative expenses of $22 million. The Company also reported net income of $15 million, or $0.08 diluted EPS, and net revenues of $367 million for the first quarter ended March 31, 2012.

84. On May 1, 2012, the Individual Defendants caused Polycom to file its Form 10-Q with the SEC for the first quarter ended March 31, 2012. The Form 10-Q reported the same financial results for the Company's first quarter ended March 31, 2012, as reported in the

Company's April 18, 2012 press release.  The Form 10-Q also included a certification by Miller in the same, or substantially the same, form as set forth above in paragraph 59.

85.    On July 24, 2012, the Individual Defendants caused Polycom to issue a press release announcing its second quarter 2012 financial results.  The Company reported total operating expenses of $210 million, including general and administrative expenses of $24 million.  The Company also reported net income of $7 million, or $0.04 diluted EPS, and net revenues of $359 million for the second quarter ended June 30, 2012.

86.    On August 1, 2012, the Individual Defendants caused Polycom to file its Form 10-Q with the SEC for the second quarter ended June 30, 2012.  The Form 10-Q reported the same financial results for the Company's second quarter ended June 30, 2012, as reported in the Company's July 24, 2012 press release.  The Form 10-Q also included a certification by Miller in the same, or substantially the same, form as set forth above in paragraph 35.

87.    On October 23, 2012, the Individual Defendants caused Polycom to issue a press release announcing its third quarter 2012 financial results.  The Company reported net income of $(15.0) million, or $(0.08) diluted EPS, and revenue of $335 million for the third quarter ended September 30, 2012.

88.    On October 31, 2012, the Individual Defendants caused Polycom to file its Form 10-Q with the SEC for the third quarter ended September 30, 2012.  The Form 10-Q reported the same financial results for the Company's third quarter ended September 30, 2012 as reported in the Company's October 23, 2012 press release.  The Form 10-Q also included a certification by Miller in the same, or substantially the same, form as set forth above in paragraph 59.

89.    On January 23, 2013, the Individual Defendants caused Polycom to issue a press release announcing its fourth quarter and fiscal year ended December 31, 2012 financial results.  The Company reported net income of $2 million, or $0.01 diluted EPS, and revenue of $353 million for the fourth quarter ended December 31, 2012.  Further, the Company reported net income of $9.75 million, or $0.06 diluted EPS, and revenue of $1.39 million for the fiscal year ended December 31, 2012.

90.     On February 14, 2013, the Individual Defendants caused Polycom to file its Form 10-K with the SEC for its fiscal year ended December 31, 2012.  The Form 10-K included a certification by Miller in the same, or substantially the same, form as set forth above in paragraph 35, and further reported the same year-end financial results reported in the Company's January 23, 2013 press release.

91.     The Form 10-K further stated in part:

> **Evaluation of disclosure controls and procedures**
>
> Our management evaluated, with the participation of our Chief Executive Officer and our Chief Financial Officer, the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Annual Report on Form 10-K.  Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures are effective at a reasonable level of assurance to ensure that information we are required to disclose in reports that we file or submit under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and (ii) is accumulated and communicated to Polycom's management, including our Chief Executive Officer and our Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.  Our disclosure controls and procedures include components of our internal control over financial reporting. Management's assessment of the effectiveness of our internal control over financial reporting is expressed at the level of reasonable assurance because a control system, no matter how well designed and operated, can provide only reasonable, but not absolute, assurance that the control system's objectives will be met.

92.     On April 19, 2013, the Individual Defendants caused Polycom to issue its 2013 Form 14(a) Proxy Statement to shareholders, which was published to the SEC website.  This proxy statement contained the following report of the Board's Audit Committee for fiscal year 2010:

> **AUDIT COMMITTEE REPORT**
>
> The Audit Committee assists the Board of Directors in fulfilling its responsibilities for oversight of the integrity of Polycom's financial statements, our internal accounting and financial controls, our compliance with legal and regulatory requirements, the organization and performance of our internal audit function and the qualifications, independence and performance of our independent registered public accounting firm.

The management of Polycom is responsible for establishing and maintaining internal controls and for preparing Polycom's consolidated financial statements.  The independent registered public accounting firm is responsible for auditing the financial statements. It is the responsibility of the Audit Committee to oversee these activities.

The Audit Committee has:

- Reviewed and discussed the audited financial statements with Polycom management and with PricewaterhouseCoopers LLP, Polycom's independent registered public accounting firm;

- Discussed with PricewaterhouseCoopers LLP the matters required to be discussed by the Statement on Auditing Standards No. 61, Communications with Audit Committees, as amended, and as adopted by the Public Company Accounting Oversight Board;

- Discussed with Polycom management, Polycom Internal Audit, and PricewaterhouseCoopers LLP the evaluation of Polycom's internal controls and the audit of the effectiveness of Polycom's internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act of 2002; and

- Received the written disclosures and the letter from PricewaterhouseCoopers LLP required by applicable requirements of the Public Company Accounting Oversight Board regarding PricewaterhouseCoopers LLP's communications with the Audit Committee concerning independence and has discussed with PricewaterhouseCoopers LLP their independence.

Based upon these discussions and review, the Audit Committee recommended to the Board of Directors that the audited financial statements be included in Polycom's Annual Report on Form 10-K for the fiscal year ended December 31, 2011 for filing with the U.S. Securities and Exchange Commission.

*Submitted by the members of the Audit Committee of the Board of Directors*

John A. Kelley
D. Scott Mercer
Kevin T. Parker (Chairman)

93.    On April 23, 2013, the Individual Defendants caused Polycom to issue a press announcing its first quarter 2013 financial results.  The Company reported net income of $3 million, or $0.01 diluted EPS, and net revenues of $339 million for the first quarter ended March 31, 2013.

94.     On April 30, 2013, the Individual Defendants caused Polycom to file its Form 10-Q with the SEC for the first quarter ended March 31, 2013.  The Form 10-Q reported the same financial results for the Company's first quarter ended March 31, 2013, as reported in the Company's April 23, 2013 press release.  The Form 10-Q also included a certification by Miller in the same, or substantially the same, form as set forth above in paragraph 59.

95.     The foregoing statements were materially misleading when made for the reasons discussed above in paragraph 67.

96.     On July 23, 2013, the price of Polycom's common stock closed at $11.18 per share.

**F.      The Truth is Revealed**

97.     On July 23, 2013, after the market closed, the Individual Defendants caused Polycom to issue a press release announcing its second quarter 2013 financial results.  The Company reported net income of $5 million, or $0.03 diluted EPS, and net revenues of $345 million for the second quarter ended June 30, 2013.  Subsequently, the Company filed a Form 8-K with the SEC, announcing the resignation of Miller, which stated in pertinent part:

> **Item 8.01.  Other Events**.
>
> On July 17, 2013, the Audit Committee of the Board completed a review of certain of Mr. Miller's expense submissions.  The Audit Committee found certain irregularities in these submissions.  At the conclusion of the review, Mr. Miller accepted responsibility and submitted the letter referred to in Item 5.02.  The amounts involved did not have a material impact on the Company's previously reported financial statements for any period.

98.     Publicly, through a press release and during an analyst call, Parker – Polycom's then, newly-anointed interim CEO, and a member of the Audit Committee – lamented how "Andy Miller's resignation under these circumstances is disappointing," and acknowledged how "[t]his is a tough set of circumstances."  Nonetheless, Parker attempted to assure the public through the prepared press release and during the analyst call that Polycom's focus was on moving forward, and that Miller's misdeeds should "not be seen as a reflection of the financial integrity of the company."

99.     Analysts slammed Polycom following Miller's resignation, downgrading it to "underperform" and "underweight."  Piper Jaffray declared that "[t]he departure of CEO Andy Miller…*raises red flags and we believe management credibility (at all executive levels) comes into question*."  Janney Capital similarly warned that because Miller "spearheaded the recent expansion in direct selling model and recruited most of the current sales leadership team," the "sales turnover is a real threat."  In a similar vein, Wedbush concluded that "[g]iven Miller's role in shaping senior management, we also have concerns regarding the potential for additional management upheaval and sales force attrition" and, as an example, pointed to the departure of Polycom's Executive Vice President of Global Sales, a miller appointee.

100.    The same day, during an earnings call announcing the Company's Q2 2013 financial results, analysts questioned Polycom's "organizational stability" in light of Miller's forced resignation, as Miller "had a very loyal following at the company."  *See* Polycom Q2 2013 Earnings Call, 7/23/2013.

101.    Analysts reacted negatively to Miller's departure.  For example, RBC Capital Markets downgraded Polycom to "underperform" and concluded that "[t]he management transition presents yet another factor of uncertainty in the company's near-term direction."  *See* RBC Capital Markets report, July 24, 2013.  Piper Jaffray also downgraded Polycom to "underweight" and lamented that "[t]he departure of CEO Andy Miller…raises red flags and we believe management credibility (at all executive levels) comes into question."  Indeed, Piper Jaffray "view[ed] the departure of Mr. Miller as a longer term headwind for a company that was already struggling to find direction."  *See* Piper Jaffray report, July 24, 2013.  Janney Capital Markets similarly warned that "Miller was an execution-focused CEO, who spearheaded the recent expansion in direct selling model and recruited most of the current sales leadership team," therefore "[w]ith pressure on the sales force still high…sales turnover is a real threat."  *See* Janney Capital Markets report, July 24, 2013.  Likewise, Wedbush cautioned that Miller's resignation introduces risks and "heightens investor skepticism."  "Given Mr. Miller's role in shaping senior management, we also have concerns regarding the potential for additional management upheaval and sales force attrition.  We note that EVP of

Global Sales Tracey Newell, appointed by Mr. Miller, has also indicated she will be leaving the firm in August." *See* Wedbush Equity Research, July 24, 2013.

102. The SEC also commenced an investigation in July 2013 into the Audit Committee's review of Miller's expense submissions and his resignation. That investigation is ongoing, even though the Individual Defendants did not disclose this fact until two months later. To date, Polycom squandered over $3 million in connection with SEC investigation.

103. On this news, shares of Polycom fell $1.68 cents, or over 15%, to $9.50 per share on July 24, 2013, on volume of over 11 million shares. This decline wiped out over $275 million in market value.

104. On this news, the price of Polycom stock declined by 15%, closing at $9.49 per share on July 24, 2013, down $1.69 per share on unusually high trading volume.

105. The true facts, which were known by the Individual Defendants but concealed from the investing public during the Relevant Period, were as follows:

    a) Polycom's CEO was submitting improper expense reimbursements;

    b) Polycom's internal controls were inadequate to prevent its officers from submitting improper reimbursement requests; and

    c) The Individual Defendants had failed to discharge their fiduciary duties of due diligence and reasonable care by failing to take reasonable steps to implement or ensure compliance with adequate expense reimbursement policies and procedures.

106. As a result of the Individual Defendants' materially misleading statements, failure to maintain adequate internal controls, and failure to discharge their fiduciary duties to Polycom and its shareholders, Polycom stock traded at inflated levels during the Relevant Period. However, after the above revelations seeped into the market, the price of Polycom stock was hammered by massive sales, sending it down 15% in one day's trading.

### G.  The Director Defendants Cause Polycom to Repurchase Its Common Stock at Artificially Inflated Prices

107.    While the Individual Defendants were making and/or approving misleading and improper statements that artificially inflated Polycom's stock price, the Director Defendants simultaneously directed or permitted the Company to overpay for its own stock through massive repurchases.  As the Individual Defendants caused the Company to explain in Polycom's April 30, 2013 Form 10-Q, the Director Defendants caused the Company to repurchase $34 million of its own common stock.  Moreover, as discussed in Polycom's July 23, 2013 Form 10-Q, the Individual Defendants authorized an additional $100 million in repurchase allotment in May 2013, and caused the Company to repurchase an additional $50 million of its own common stock during the second quarter of 2013.

108.    These Director Defendants knew or recklessly disregarded the fact that the Company's stock was artificially inflated due to the misleading statements alleged herein, and they failed to prevent the Company from repurchasing its stock at inflated prices.  These inflated repurchases caused significant damage to Polycom and was not a valid exercise of business judgment.

### H.  The Individual Defendants Privately Authorize an Unjustified Golden Parachute Payment to Miller

109.    On the eve of authorizing a press release and public statements decrying Miller's actions – and the day before Polycom's stock would be hammered by the news of Miller's "disappointing" actions – away from the spotlight of press releases and analyst calls, the Individual Defendants quietly negotiated a "Separation Agreement and Release," which, to the detriment of Polycom and its shareholders, awarded Miller a golden parachute:

> (a)    The Separation Agreement and Release awarded Miller a lump sum cash payment of $500,000;

> (b)    The Separation Agreement and Release confirmed that Miller would continue to be eligible for his bonus for the first half of 2013 (despite Miller engaging in the very behavior during this period that caused the "expense

irregularities" that ultimately led to his resignation only weeks after the period ended);

(c)      Miller was awarded an additional payment equal to the cost of 12 months of COBRA insurance payments;

(d)      Miller was authorized to keep two company laptops, a company iPad tablet, and a company Samsung Galaxy 4 mobile device;

(e)      While Miller resigned on or about July 19, 2013, the agreement set a different, "Separation Date" of August 15, 2013, and confirmed that, in addition to the compensation described above, Miller would continue to receive his regular base salary through the Separation Date; and

(f)      The August 15, 2013 Separation Date, upon information and belief, was also purposefully designed to allow Miller to be awarded a substantial number of additional Polycom stock shares through both "Restricted Stock Unit Awards" and "Performance Share Awards," which would not vest unless Miller remained an employee of Polycom beyond his July 19, 2013 resignation date; specifically: (i) 50,000 shares under Restricted Stock Unit Awards were "scheduled to vest on 8/1/2013, subject to [Miller's] continued employment with the Company" through that date; and (ii) an estimated target of 50,000 shares, and potentially as many of 75,000 shares, were "eligible to vest upon completion of the award's first performance period ending 7/31/2013, subject to actual performance and [Miller's] continued employment with the Company through the later of August 1, 2013, or the date the independent members of the Company's Board of Directors certify achievement of the applicable performance criteria (expected to occur on August 7, 2013)."

110.      The Separation Agreement and Release even committed Polycom to "reimburse [Miller] for his reasonable attorneys' fees and costs incurred in connection with the preparation of" the Separation Agreement and Release and Miller's resignation, up to $25,000.

111.    Further, as noted above, the Form 8-K that the Individual Defendants caused Polycom to file with the SEC on or about July 23, 2013, represented that "[o]n July 17, 2013, the Audit Committee of the Board **completed** a review of certain of Mr. Miller's expense submissions.  The Audit Committee found certain irregularities in these submissions.  At the **conclusion of the review**, Mr. Miller accepted responsibility" and resigned.  (Emphasis added.)  But, as the Individual Defendants would later cause Polycom to admit, Polycom's investigation into the full nature, extent, and scope of Miller's wrongdoing remained ongoing and therefore had not actually been completed.  Nor had Miller resigned "at the conclusion of" the Company's review.

112.    In other words, contemporaneously with approving a golden parachute to Miller through the Separation Agreement and Release, the Individual Defendants caused Polycom to falsely or misleadingly represent that the Company's investigation of Miller's expense reports was complete.   The Individual Defendants gave no indication to the investing public whatsoever that Polycom's review of Miller's misconduct was still ongoing.   And the Individual Defendants concealed from the investing public that Polycom had entered into the golden parachute Separation Agreement and Release – promising Miller hundreds of thousands of dollars in cash payments, promising him bonus eligibility, allowing him to keep expensive electronic equipment, and allowing him to remain a Polycom employee so that "Restricted Stock Unit Awards" and "Performance Share Awards" would vest giving him 100,000 + shares in Polycom with a street value of close to $1 million dollars – **all before Polycom had even truly assessed the full, scope, extent, and financial impact of Miller's wrongdoing**.

113.    Thereafter, on or about September 11, 2013, the Individual Defendants caused Polycom to file a Form 8-K with the SEC, admitting that, after the Separation Agreement and Release was entered into, Polycom's investigation continued and found even more improprieties by Miller, including as far back as 2010.  The Form 8-K revealed (in relevant part):

On July 23, 2013, Polycom, Inc. (the "Company" or "Polycom") announced that the Audit Committee of the Board of Directors of Polycom completed a review of certain expense submissions of Polycom's then Chief Executive Officer and President, Andy Miller. The Audit Committee found certain irregularities in these submissions. At the conclusion of the review, Mr. Miller resigned from the positions of Chief Executive Officer and President from the Board. The Company's review of Mr. Miller's expenses has continued, including for the years ended December 31, 2010, 2011, and 2012. Based on its review to date, the Company believes that some of Mr. Miller's expenses during each of those years, which were accounted for as business expenses, were personal expenses.

114. Remarkably, also in the 8-K, the Individual Defendants caused Polycom to take the position that, while Polycom had not yet determined the actual amounts of Miller's improperly submitted personal expenses, "the Company continues to conclude that the amounts involved did not have a material impact on the Company's previously reported financial statements." Yet, the Individual Defendants also caused Polycom to disclose in the Form 8-K, "[t]he SEC has commenced an investigation concerning the Audit Committee's review of Mr. Miller's expenses and his resignation, and it has requested information from us. We are cooperating with the investigation."

## V. DUTIES OF THE INDIVIDUAL DEFENDANTS

### A. Fiduciary Duties

115. By reason of their positions as officers, directors, and/or fiduciaries of Polycom and because of their ability to control the business and corporate affairs of Polycom, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Polycom in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Polycom and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

116. Each director and officer of the Company owes to Polycom and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the

1  Individual Defendants had a duty to promptly disseminate accurate and truthful information

2  with regard to the Company's operations, performance, management, projections, and

3  forecasts so that the market price of the Company's stock would be based on truthful and

4  accurate information.

5  **B.    Audit Committee Duties**

6  117.    In addition to these duties, the members of the Audit Committee owed specific

7  duties to Polycom under the Audit Committee's Charter to review and approve quarterly and

8  annual financial statements and earnings press releases, and to ensure that the Company had

9  appropriate and effective internal controls over financial reporting, including reporting for

10  material expense reimbursements by senior executive officers.

11  118.    Specifically, the Charter for the Audit Committee of the Board of Directors of

12  Polycom ("the Audit Committee Charter") defines the Audit Committee's purpose to be

13  (among other purposes) to:

14  • "provide oversight of (1) the Company's accounting and financial reporting

15  processes, (2) the audit of the Company's financial statements, and (3) the

16  Company's internal control and audit functions;"

17  • "assist the Board of Directors in oversight of (1) the integrity of the Company's

18  financial statements, (2) the Company's internal accounting and financial

19  controls, (3) the Company's compliance with financial and disclosure

20  regulatory requirements, [and] (4) the organization and performance of the

21  Company's internal audit function…;" and

22  • "provide to the Board of Directors such information and materials as it may

23  deem necessary to make the Board aware of significant matters within its

24  oversight role that require the attention of the Board."

25  119.    The Audit Committee Charter also establishes specific requirements regarding

26  the committee's composition, including, in part:

27

28

39

- "each member will be able to read and understand fundamental financial statements, in accordance with Audit Committee requirements of the Nasdaq rules;

- "at least one member will have past employment experience in financing or accounting, requisite professional certification in accounting, or other comparable experience or background, including a current or past position as a chief executive officer, principal financial officer or other senior officer with financial oversight responsibilities, in accordance with the Audit Committee requirements of the Nasdaq Rules; and

- "at least one member will be an 'audit committee financial expert' as defined in the rules of the SEC."

120.   Upon information and belief, the aforementioned committee requirements are designed to ensure that, provided they otherwise discharge their fiduciary duties, the Audit Committee members have the requisite skill set to proactively guard against, expeditiously identify, and correct identified issues or irregularities.

121.   The Audit Committee Charter further delineates specific "responsibilities and duties" of the Audit Committee.  Those duties include (without limitation):

- "reviewing the reports of management, internal audit and the independent auditors concerning the design, implementation and maintenance of the Company's internal controls and procedures for financial reporting, including reviewing before release the Company's disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure;"

- "reviewing before release the unaudited quarterly operating results in the Company's quarterly earnings release and reviewing and discussing with management the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under

40

'Management's Discussion and Analysis of Financial Condition and Results of Operations,' prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;"

- "reviewing suggestions for improvements to the internal control systems highlighted by management, internal audit and the independent auditors and management's plan of action to implement such suggestions;"

- "providing oversight and review at least annually of the Company's significant financial and accounting policies, including its investment policies, commitment and expenditure authorization policy, revenue recognition policy, credit policy, foreign currency policy, Related Person Transaction Approval Policy and capital expenditure policy;"

- "reviewing the activities, organizational structure and qualifications of the internal audit function;"

- "reviewing and improving changes to the internal audit charter;"

- "reviewing periodically with the Company's Chief Internal Audit Executive and Compliance Officer and issues encountered in the course of the internal audit function's work;"

- "reviewing matters related to the Company's Compliance Program including receiving periodic reports from management;" and

- "reviewing, approving and discussing compliance with management concerning the Company's code of ethics for its principal executives and senior financial officers."

**C.    Control, Access, And Authority**

122.    The Individual Defendants, because of their positions of control and authority as directors, officers, and/or Audit Committee members of Polycom, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Polycom.

123.    Because of their advisory, executive, managerial, committee, and/or directorial positions with Polycom, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Polycom.

124.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Polycom, and was at all times acting within the course and scope of such agency.

**D.    Reasonable And Prudent Supervision**

125.    To discharge their duties, the officers and directors of Polycom were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company's financial affairs.  By virtue of such duties, the officers and directors of Polycom were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(d)    remain informed as to how Polycom conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)    ensure that Polycom was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## VI.    BREACHES OF DUTIES

126.    Each Individual Defendant, by virtue of his or her position as a director, officer, and/or Audit Committee member, owed to Polycom and to its shareholders the fiduciary duties of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of Polycom, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Polycom, the absence of good faith on their part, and a reckless disregard for their duties to Polycom, and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Polycom.

127.    The Individual Defendants each breached their duties of loyalty and good faith by making, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders concerning the adequacy of the Company's internal controls regarding executive expense reimbursement, and about Miller's compliance with such policies.  The Individual Defendants further each breached their duty to exercise due care and diligence in the management and administration of the affairs of Polycom by failing to take reasonable steps to implement and ensure compliance with adequate expense reimbursement policies and procedures.   The Individual Defendants further each breached their duties of loyalty and to exercise due care and diligence in the use and preservation of the Company's property and assets, by approving or failing to take reasonable steps to prevent the execution of the Separation Agreement and Release, instead improperly, unfairly, and unjustifiably granting Miller a golden parachute effectively rewarding him for his misconduct, which breaches were exacerbated and compounded by the fact that the Separation Agreement and Release was executed well before the Individual Defendants completed a full review of the true extent, scope, and financial impact of Miller's misconduct.  In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of the federal securities laws.  As a result, Polycom has

1    expended, and will continue to expend, significant sums of money to rectify the Individual

2    Defendants' wrongdoing.

3    **VII.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

4        128.    In committing the wrongful acts alleged herein, the Individual Defendants have

5    pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert

6    with and conspired with one another in furtherance of their wrongdoing.   The Individual

7    Defendants further aided and abetted and/or assisted each other in breaching their respective

8    duties.

9        129.    During all times relevant hereto, the Individual Defendants collectively and

10   individually initiated a course of conduct that misled shareholders concerning the adequacy of

11   the Company's internal controls regarding executive expense reimbursement, and about

12   Miller's compliance with such policies.   In furtherance of this plan, conspiracy, and course of

13   conduct, the Individual Defendants collectively and individually took the actions set forth

14   herein.

15       130.    The purpose and effect of the Individual Defendants' conspiracy, common

16   enterprise, and/or common course of conduct was, among other things, to: (a) disguise the

17   Individual Defendants' violations of law, including breaches of fiduciary duties, unjust

18   enrichment, and waste of corporate assets; and (b) disguise and misrepresent the Company's

19   future business prospects.

20       131.    The Individual Defendants accomplished their conspiracy, common enterprise,

21   and/or common course of conduct by causing the Company to purposefully, recklessly, or

22   negligently release improper statements.   Because the actions described herein occurred under

23   the authority of the Board, each of the Individual Defendants was a direct, necessary, and

24   substantial participant in the conspiracy, common enterprise, and/or common course of

25   conduct complained of herein.

26       132.    Each of the Individual Defendants aided and abetted and rendered substantial

27   assistance in the wrongs complained of herein.   In taking such actions to substantially assist

28   the commissions of the wrongdoing complained of herein, each Individual Defendant acted

1   with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that

2   wrongdoing, and was aware of his or her overall contribution to and furtherance of the

3   wrongdoing.

4   **VIII.   DAMAGES TO POLYCOM**

5        133.   As a result of the Individual Defendants' wrongful conduct, Polycom

6   disseminated false and misleading statements.   The improper statements have devastated

7   Polycom's credibility.  Additionally, Polycom is now the subject of a securities fraud class

8   action lawsuit and is under investigation by the SEC.  The Company will face substantial costs

9   in connection with the lawsuit and the SEC investigation.

10       134.   As a direct and proximate result of the Individual Defendants' actions as

11   alleged above, Polycom's market capitalization has been substantially damaged.

12       135.   Further, as a direct and proximate result of the Individual Defendants' conduct,

13   Polycom has expended and will continue to expend significant sums of money.  Such

14   expenditures include, but are not limited to:

15            a.   costs incurred in investigating and defending Polycom and certain

16                 officers in a class action lawsuit, plus potentially millions of dollars in

17                 settlement or to satisfy an adverse judgment;

18            b.   costs incurred in complying with the SEC's investigation;

19            c.   costs incurred from compensation and benefits paid to the Individual

20                 Defendants, which compensation was based at least in part on Polycom

21                 artificially-inflated stock price and inflated revenues;

22            d.   costs incurred from substantial compensation, bonuses, and benefits

23                 paid, or to be paid, to Miller, despite Miller having resigned because of

24                 expense and accounting regularities; and

25            e.   costs incurred from the loss of the Company's customers' confidence in

26                 Polycom services.

27       136.   Moreover, these actions have irreparably damaged Polycom's corporate image

28   and goodwill.  For at least the foreseeable future, Polycom will suffer from what is known as

the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Polycom's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## IX. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

137.    Plaintiffs bring this action derivatively in the right and for the benefit of Polycom to redress injuries suffered, and to be suffered, by Polycom as a direct result of the Individual Defendants' breaches of fiduciary duties, unjust enrichment, and waste of corporate assets, as well as the aiding and abetting thereof, by the Individual Defendants.  Polycom is named as a nominal defendant solely in a derivative capacity.

138.    Plaintiffs will adequately and fairly represent Polycom's interests in enforcing and prosecuting its rights.

139.    Plaintiffs held shares of Polycom common stock during the Relevant Period and continue to hold shares of Polycom common stock.

140.    Plaintiffs did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

141.    At the time this action was initiated, the Board of Polycom consisted of the following five Director Defendants: Atkins, Kelley, Mercer, Owens, and Parker.

### A.    The Director Defendants Face a Substantial Likelihood of Liability

142.    Director Defendants Atkins, Kelley, Mercer, Owens, and Parker face a substantial likelihood of liability for their individual misconduct.  As members of the Board throughout the Relevant Period, these Director Defendants had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true.  Moreover, they owed duties to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and care.  Instead, they knowingly and/or with reckless disregard reviewed and authorized the publication of

1    materially false and misleading statements throughout the Relevant Period that caused the

2    Company's stock to trade at artificially inflated prices.

3        143.   Moreover, the Director Defendants failed to discharge their duty to, in good

4    faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure

5    that the Company's internal auditing and accounting controls were sufficiently robust and

6    effective (and/or were being implemented effectively), and to ensure that the Audit

7    Committee's duties were being discharged in good faith and with the required diligent care.

8    This authorization of false and/or misleading statements throughout the Relevant Period,

9    failure to correct such statements, failure to take necessary and appropriate steps to ensure that

10   the Company's internal auditing and accounting controls were sufficiently robust and effective

11   (and/or were being implemented effectively), and/or failure to take necessary and appropriate

12   steps to ensure that the Audit Committee's duties were being discharged in good faith and the

13   required diligence constitutes a breach of their fiduciary duties, for which Defendants Atkins,

14   Kelley, Mercer, Owens, and Parker face a substantial likelihood of liability.

15       144.   Further, the Director Defendants face a substantial likelihood of liability for

16   wasting corporate assets by awarding Miller unjustifiable compensation and benefits through

17   the Separation Agreement and Release, by allowing or unreasonably failing to prevent or

18   expeditiously discover and stop the payment of improper expense reimbursements to Miller

19   during the Relevant Period, or by causing the Company to incur potentially millions of dollars

20   of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.  If

21   the Director Defendants were to bring a suit on behalf of Polycom to recover for damages

22   sustained as a result of this misconduct, they would expose themselves to significant liability.

23   This is something they will not do.  For this reason, demand is futile.

24       **B.**    **Demand is Futile as to the Audit Committee Defendants**

25       145.   Defendants Mercer, Kelley, and Parker, as Audit Committee members, were

26   responsible for reviewing and approving quarterly and annual financial statements and

27   earnings press releases, and reviewing and approving Polycom's internal controls over

28   financial reporting.  Despite these duties, Defendants Mercer, Kelley, and Parker knowingly

and/or recklessly reviewed and approved false financial statements and press releases. Moreover, the Audit Committee Defendants failed to discharge their fiduciary duties to ensure that the Company's internal auditing and accounting controls, including its expense reimbursement policies and procedures, were sufficiently robust and effective.  Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon these Defendants therefore is futile.

146.    In fact, these Director Defendants expressly acknowledged having contemporaneous and direct access to specific, material facts that contradicted and demonstrated the misleading nature of the above challenged statements, and to facts demonstrating Polycom's inadequate internal controls.  As a result of this access, they knew or recklessly disregarded the material falsity of these statements and thus face a substantial likelihood of liability for breach of fiduciary duty.

147.    For example, as members of Polycom's Audit Committee during the Relevant Period, these Defendants were responsible for reviewing and approving quarterly and annual financial statements and earnings press releases, and reviewing and approving Polycom's internal controls over financial reporting.

148.    Specifically, the Charter for the Audit Committee of the Board of Directors of Polycom ("the Audit Committee Charter") defines the Audit Committee's purpose to be (among other purposes) to:

- "provide oversight of (1) the Company's accounting and financial reporting processes, (2) the audit of the Company's financial statements, and (3) the Company's internal control and audit functions;"

- "assist the Board of Directors in oversight of (1) the integrity of the Company's financial statements, (2) the Company's internal accounting and financial controls, (3) the Company's compliance with financial and disclosure regulatory requirements, [and] (4) the organization and performance of the Company's internal audit function…;" and

- "provide to the Board of Directors such information and materials as it may deem necessary to make the Board aware of significant matters within its oversight role that require the attention of the Board."

149.    Therefore, they gained direct access to and had the authority and obligation to review Polycom's internal controls processes and audited statements, including processes related to expense approvals and any audits of expense reports.  In this position of oversight, Mercer, Kelley, and Parker discovered that no audit of Miller's expenses was ever conducted, which allowed Miller to get away with blatantly and transparently fleecing the Company for over three years.  This knowledge alerted them to the fact that Polycom's internal controls were woefully deficient, yet they utterly failed to take any action to rectify this issue.

150.    This knowledge is indicated by more than a recitation of the Company's Audit Committee duties, however, but *by the express admission of Defendants Mercer, Kelley, and Parker*.  In particular, these Defendants acknowledged in each Polycom proxy statement during the Relevant Period that he not only had a duty to review the Company's internal controls processes, audit processes, and financial statements, but that they actually did so.  As indicated above, they acknowledged in the Company's annual Audit Committee Report that he, *inter alia*, "reviewed and discussed the audited financial statements with Polycom management," and "discussed with Polycom management, Polycom Internal Audit, and PricewaterhouseCoopers LLP the evaluation of Polycom's internal controls and the audit of the effectiveness of Polycom's internal control over financial reporting."  Therefore, they did in fact review Polycom's financial statements, internal controls, and auditing processes, and thus knew or recklessly disregarded that the Company lacked even the most basic internal controls to prevent Miller from blatantly and materially fleecing the Company through improper expense reimbursements.

**C.    Demand is Futile Because the Director Defendants are Not Independent From Miller**

151.    As discussed above, the Director Defendants granted Miller carte blanche to enact wholesale changes at Polycom, which put Miller in a unique position of power over the

1    Company that allowed him to abuse his power for personal purposes.   The Director

2    Defendants' willingness to turn a blind eye to Miller's misconduct in order to allow him to

3    enact these wholesale changes demonstrates how beholden they were to him throughout the

4    Relevant Period.

5         152.    This lack of independence from Miller is further demonstrated by the Director

6    Defendants' decision to privately authorize a substantial, unjustified golden parachute

7    separation package for Miller after the Director Defendants discovered Miller's improper

8    conduct.  This action demonstrates the Director Defendants' willingness to put the interests of

9    their long-time personal and professional colleague – who admitted to substantially damaging

10   the Company to whom these directors owe fiduciary duties – ahead of the interests of Polycom

11   and its shareholders.  Thus, this unjustified action, which was not a valid exercise of business

12   judgment, raises a reasonable doubt as to these Director Defendants' ability to independently

13   consider a demand to initiate litigation against Miller.  For this additional reason, demand is

14   futile.

15        **D.    Demand is Futile as to All Directors for Additional Reasons**

16        153.    If Polycom's current officers and directors are protected against personal

17   liability for their acts of mismanagement, abuse of control, and breaches of fiduciary duties

18   alleged in this Complaint by D&O Insurance, they caused the Company to purchase that

19   insurance for their protection with corporate funds, *i.e.*, monies belonging to the

20   shareholders.  However, Plaintiff is informed and believes that the D&O Insurance policies

21   covering the Individual Defendants in this case contain provisions that eliminate coverage for

22   any action brought directly by Polycom against the Individual Defendants, known as the

23   "insured versus insured exclusion."  As a result, if the Director Defendants were to sue

24   themselves or certain of the officers of Polycom, there would be no D&O Insurance protection,

25   and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the

26   suit is brought derivatively, as this action is brought, such insurance coverage exists and will

27   provide a basis for the Company to effectuate recovery.  Therefore, the Director Defendants

28

1  cannot be expected to file the claims asserted in this derivative lawsuit because such claims

2  would not be covered under the Company's D&O insurance policy.

3      154.    Under the factual circumstances described herein, the Individual Defendants are

4  more interested in protecting themselves than they are in protecting Polycom by prosecuting

5  this action.  Therefore, demand on Polycom and its Board is futile and is excused.

6      155.    Polycom has been and will continue to be exposed to significant losses due to

7  the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any

8  lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus,

9  the Director Defendants are breaching their fiduciary duties to the Company and face a

10 sufficiently substantial likelihood of liability for their breaches, rendering any demand upon

11 them futile.

12                                    **COUNT I**

13              **Against The Individual Defendants for Breach of Fiduciary Duties**

14     156.    Plaintiffs incorporate by reference and reallege each and every allegation

15 contained above, as though fully set forth herein.

16     157.    The Individual Defendants owed and owe Polycom fiduciary obligations.  By

17 reason of their fiduciary relationships, the Individual Defendants owed and owe Polycom the

18 highest obligations of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight

19 and supervision.

20     158.    The Individual Defendants violated and breached their fiduciary duties of good

21 faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

22     159.    The Individual Defendants each knowingly, recklessly, or negligently approved

23 the issuance of false statements that misrepresented and failed to disclose material information

24 concerning the Company.  These actions could not have been a good faith exercise of prudent

25 business judgment to protect and promote the Company's corporate interests.

26     160.    As a direct and proximate result of the Individual Defendants' failure to

27 perform their fiduciary obligations, Polycom has sustained significant damages.  As a result of

28 the misconduct alleged herein, these Defendants are liable to the Company.

161.    Plaintiffs, on behalf of Polycom, have no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

162.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

163.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Polycom.

164.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Polycom.

165.    Plaintiffs, as shareholders and representatives of Polycom, seek restitution from these Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

166.    Plaintiffs, on behalf of Polycom, have no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Corporate Waste

167.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

168.    The wrongful conduct alleged herein regarding the issuance of false and misleading statements was continuous, connected, and was on-going throughout the applicable time period.  It resulted in continuous, connected, and on-going harm to the Company.

169.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) authorizing, approving or allowing the payment of excessive compensation, bonuses, benefits, and termination payments to Miller; (ii) by allowing or unreasonably failing to prevent or expeditiously discover and stop the payment of improper expense reimbursements to Miller during the Relevant Period; (iii) by granting themselves unjustified massive raises far above industry standards; (iv) by causing Polycom to repurchase its own common stock at artificially inflated prices; and (v) causing the Company to incur

1   potentially millions of dollars of legal liability and/or legal costs to defend the Individual

2   Defendants' unlawful actions.

3        170.   As a result of the waste of corporate assets, the Individual Defendants are liable

4   to the Company.

5        171.   Plaintiffs, on behalf of Polycom, have no adequate remedy at law.

6   **X.   PRAYER FOR RELIEF**

7        WHEREFORE, Plaintiffs demand judgment as follows:

8        A.   Against all the Individual Defendants for the amount of damages sustained by

9   the Company as a result of the Individual Defendants' violations of federal securities laws,

10  breaches of fiduciary duties, unjust enrichment, and waste of corporate assets;

11       B.   Directing Polycom to take all necessary actions to reform and improve its

12  corporate governance and internal procedures to comply with applicable laws and to protect

13  Polycom and its shareholders from a repeat of the damaging events described herein,

14  including, but not limited to, putting forward for shareholder vote resolutions for amendments

15  to the Company's By-Laws or Articles of Incorporation and taking such other action as may be

16  necessary to place before shareholders for a vote the following corporate governance policies:

17          • a proposal to strengthen the Board's supervision of operations and develop and

18            implement procedures for greater shareholder input into the policies and

19            guidelines of the Board;

20          • a provision to permit the shareholders of Polycom to nominate at least two

21            candidates for election to the Board;

22          • a proposal to ensure the accuracy of the qualifications of Polycom's directors,

23            executives, and other employees;

24          • a proposal to strengthen the Company's procedures for the receipt, retention

25            and treatment of complaints received by the Company regarding accounting,

26            internal controls and auditing matters; and

27

28

VERIFIED CONSOLIDATED FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1   • a provision to appropriately test and then strengthen the internal audit and

2   control functions, including, without limitation, audit and control functions

3   related to reimbursement of expenses;

4   C. Awarding to Polycom restitution from the Individual Defendants, and each of

5   them, and ordering disgorgement of all profits, benefits, and other compensation obtained by

6   the Individual Defendants;

7   D. Awarding to Plaintiffs the costs and disbursements of the action, including

8   reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

9   E. Granting such other and further relief as the Court deems just and proper.

10   **XI.    JURY DEMAND**

11   Plaintiffs demand a trial by jury.

12

13   Dated: April 4, 2014                JOHNSON & WEAVER, LLP
                                        FRANK J. JOHNSON
14                                      SHAWN E. FIELDS

15                              By:_____*s/ Frank J. Johnson*_____
                                        FRANK J. JOHNSON
16
                                        110 West "A" Street, Suite 750
17                                      San Diego, CA  92101
                                        Telephone: (619) 230-0063
18                                      Facsimile: (619) 255-1856
                                        frankj@johnsonandweaver.com
19                                      shawnf@johnsonandweaver.com

20                                      *Lead Counsel for Plaintiffs*

21

22

23

24

25

26

27

28

VERIFIED CONSOLIDATED FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT