United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: POLYCOM, INC. DERIVATIVE     )  Case No. 13-CV-03880 SC
LITIGATION                          )
                                    )  ORDER GRANTING IN PART AND
                                    )  DENYING IN PART MOTIONS TO
                                    )  DISMISS
This Order Relates To:              )
                                    )
ALL ACTIONS                         )
                                    )
                                    )
                                    )
                                    )
                                    )
                                    )
                                    )
                                    )
                                    )
                                    )
                                    )

## I.    INTRODUCTION

Now before the Court are motions to dismiss Plaintiffs'
Verified Consolidated First Amended Shareholder Derivative
Complaint, ECF No. 47 ("Compl.").  The first motion was filed by
Polycom, Inc. and five members of its Board of Directors, Betsy S.
Atkins, John A. Kelley, D. Scott Mercer, William A. Owens, and
Kevin T. Parker,[1] (collectively, "Polycom").  ECF No. 48 ("Polycom
Mot.").  The second motion was filed by Polycom's former CEO and

_____

[1] The Court will refer to the Board Members collectively as simply
"the Board" or "the Board Members."  In addition to serving on the
board, three individual defendants, Kelley, Mercer, and Parker
served on Polycom's Audit Committee.  The Court will refer to these
individuals specifically as the "Audit Committee."

**United States District Court**
For the Northern District of California

1   Defendant Andrew Miller.  ECF No. 51 ("Miller Mot.").  The motions

2   are fully briefed,[2] and appropriate for disposition without oral

3   argument under Civil Local Rule 7-1(b).  For the reasons set forth

4   below, the motions are GRANTED IN PART and DENIED IN PART.

5

6   **II.   <u>BACKGROUND</u>**

7       This is a shareholder derivative suit against Polycom, a San

8   Jose-based provider of video and telecommunication systems,

9   arising out of allegations of misconduct by Polycom's CEO, Andrew

10  Miller.  Miller resigned after an investigation by Polycom's Audit

11  Committee, made up of Kelley, Mercer, and Parker, found problems

12  with Miller's expense reimbursements.

13      During Miller's tenure as CEO, he allegedly claimed

14  reimbursements for numerous inappropriate personal expenses.

15  According to a confidential witness for Plaintiffs, this behavior

16  was well-known within Polycom, although the parties disagree about

17  the extent and import of any such knowledge.  In any event, after

18  an investigation, Miller and Polycom entered into a separation

19  agreement.  Under the separation agreement, Miller agreed to

20  resign, release compensation and employment-related claims against

21  Polycom, and provide continued assistance through a transition

22  period in exchange for a severance package.  Following Miller's

23  resignation, Polycom stated in a press release that "[t]he amounts

24  [of the inappropriate personal expenses] did not have a material

25  impact on the Company's current or previously reported financial

26  statements for any period, nor did they involve any other

27

28  ─────────────────────
    [2] ECF Nos. 59 ("Opp'n"), 60 ("Polycom Reply"), 61 ("Miller Reply").

**United States District Court**
For the Northern District of California

1  employees."  ECF No. 50 ("Rucker Decl.") Ex. A ("Form 8-K").[3]

2      Shortly thereafter, Plaintiffs filed derivative complaints

3  alleging breaches of fiduciary duty, unjust enrichment, and

4  corporate waste against Miller and the Director Defendants.  In

5  Plaintiffs' view, the Board made false statements (or allowed such

6  statements to be made by others) about the adequacy of internal

7  controls on expense reimbursement, failed to implement and apply

8  Polycom's expense reimbursement policies, unjustifiably gave Miller

9  a 'golden parachute' without adequately assessing his conduct,

10 granted Miller a "unique position of power over the Company," in

11 which the directors were "beholden" to him, and repurchased stock

12 at prices artificially inflated by misleading statements about

13 internal controls and compliance.  See Compl. ¶¶ 31, 107-08, 112,

14 127, 142-51, 169.

15     Prior to filing suit, Plaintiffs did not demand Polycom's

16 Board pursue these claims directly on Polycom's behalf, arguing

17 that doing so would have been futile.  At the time the initial

18 complaint was filed, Polycom's Board had five members, the Board

19 Members.  Four of those, Atkins, Kelley, Mercer, and Owens, have

20 always been outside directors.  The fifth, Parker, became interim-

21 CEO after Miller's resignation.

22     Now Defendants move to dismiss, arguing that Plaintiffs'

23 failure to make a presuit demand on the Board cannot be excused.

24 In the alternative, they suggest that the complaint should be

25 ─────────────

26 [3] This document and other SEC filings are the subject of Requests
   for Judicial Notice, ECF Nos. 49, 52.  Courts often take judicial
   notice of such filings.  See In re Netflix, Inc., Sec. Litig., 923

27 F. Supp. 2d 1214, 1218 n.1 (N.D. Cal. 2013).  Because these
   documents "can be accurately and readily determined from sources

28 whose accuracy cannot reasonably be questioned," Fed. R. Evid.
   201(b), the requests are GRANTED.

1  dismissed under Federal Rule of Civil Procedure 12(b)(6).

2  Plaintiffs oppose.

3

4  **III.  LEGAL STANDARD**

5      **A.   Derivative Suits Generally**

6      Generally speaking, a corporation, not its shareholders, has

7  the sole right to pursue litigation for injuries suffered by the

8  corporation.  See Potter v. Hughes, 546 F.3d 1051, 1058 (9th Cir.

9  2008).  A shareholder derivative suit is one of the exceptions to

10 this general rule.  "The derivative form of action permits an

11 individual shareholder to bring 'suit to enforce a corporate cause

12 of action against officers, directors, and third parties.'"  Kamen

13 v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95 (1991) (quoting Ross

14 v. Bernhard, 396 U.S. 531, 534 (1970)) (emphasis in original).

15     "The theory in a derivative suit is that a corporation's board

16 has been so faithless to investors' interests that investors must

17 be allowed to pursue a claim in the corporation's name."  Robert F.

18 Booth Tr. v. Crowley, 687 F.3d 314, 316-17 (7th Cir. 2012).  This

19 is a serious remedy, and as a result, courts require a shareholder

20 'demand' the corporation bring the claim directly or show that

21 demand should be excused because the board is biased or demand is

22 otherwise futile.  Kamen, 500 U.S. at 96.

23     **B.   Pleading Standard Under Rule 23.1**

24     Federal law requires that a shareholder derivative complaint

25 describe "with particularity" "any effort by the plaintiff to

26 obtain the desired action from the directors and . . . the reasons

27 for not obtaining the action or not making the effort."  Fed. R.

28 Civ. P. 23.1(b)(3)(A)-(B).  On a motion to dismiss under Rule 23.1

**United States District Court**
For the Northern District of California

4

the Court must accept as true well-pleaded factual allegations in the complaint.  In re Cendent Corp. Deriv. Action Litig., 189 F.R.D. 117, 127 (D.N.J. 1999).

### C.  **Demand Futility Under Delaware Law**

Because Polycom is incorporated in Delaware, Delaware law supplies the standard for assessing whether the failure to make demand on the board can be excused.  Kamen, 500 U.S. at 108-09; see also In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 989-90 (9th Cir. 1999), abrogated on other grounds, S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 784 (9th Cir. 2008).   The demand requirement is "designed to give a corporation the opportunity to rectify an alleged wrong without litigation, and to control any litigation which does arise."  Aronson v. Lewis, 473 A.2d 805, 809 (Del. 1984), overruled in part on other grounds, Brehm v. Eisner, 746 A.2d 244 (Del. 2000).

In order to demonstrate that demand would have been futile, there are two relevant tests.  The first, the Aronson test, applies when plaintiffs challenge a board decision.  In re Openwave Sys. Inc. S'holder Derivative Litig., 503 F. Supp. 2d 1341, 1345 (N.D. Cal. 2007).  To satisfy the Aronson test, plaintiffs must show "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [, or] (2) the challenged transaction was otherwise the product of valid exercise of business judgment."  Aronson, 473 A.2d at 814.  The Aronson test is disjunctive, so "[i]f a derivative plaintiff can demonstrate a reasonable doubt as to the first or second prong of the Aronson test, then he has demonstrated that demand would have been futile."  Seminaris v. Landa, 662 A.2d 1350,

**United States District Court**
For the Northern District of California

1  1354 (Del. Ch. 1995).

2       The second test, the Rales test, applies "where the board that

3  would be considering the demand did not make a business decision

4  which is being challenged . . . ." Rales v. Blasband, 634 A.2d

5  927, 933 (Del. 1993). Under those circumstances, the second prong

6  of Aronson is inapplicable, and the plaintiff must plead

7  particularized facts that there is a reasonable doubt that a board

8  majority could exercise independent and disinterested business

9  judgment in responding to a demand. See Rales v. Blasband, 634

10 A.2d 927, 934 (Del. 1993).

11      Under both these tests, reasonable doubt is "akin to the

12 concept that the stockholder has a 'reasonable belief' that the

13 board lacks independence." Grimes v. Donald, 673 A.2d 1207, 1217

14 n.17 (Del. 1996), overruled on other grounds, Brehm, 746 A.2d 244.

15 The business judgment rule is the "presumption that directors

16 making a business decision, not involving self-interest, act on an

17 informed basis, in good faith, and in the honest belief that their

18 actions are in the corporation's best interest." Grobow v. Perot,

19 539 A.2d 180, 187 (Del. 1988), overruled in part on other grounds,

20 Brehm, 746 A.2d 244.

21

22 **III. DISCUSSION**

23      Plaintiffs make four claims. First, Plaintiffs claim that the

24 board failed to adequately oversee Polycom's auditing and

25 accounting controls. Second, Plaintiffs argue that Polycom issued

26 false and misleading financial statements. Third, Plaintiffs

27 believe the separation agreement the board executed with Miller

28 constitutes corporate waste and accorded excessive benefits.

**United States District Court**
For the Northern District of California

1  Finally, Plaintiffs challenge Polycom's stock repurchases.  While

2  "no single factor . . . may itself be dispositive in any particular

3  case," the Court must determine "whether the accumulation of all

4  factors creates the reasonable doubt" that the board was

5  independent and exercised independent and disinterested business

6  judgment.

7      Plaintiffs' oversight and false and misleading statement

8  claims are governed by the Rales test, while Plaintiffs' challenges

9  to the separation agreement are governed by the Aronson test.

10  Compare In re Accuray, Inc. S'holder Derivative Litig., 757 F.

11  Supp. 2d 919, 926-30 (N.D. Cal. 2010) (applying the Rales test to

12  oversight claims), with Zucker v. Andreessen, No. 6014-VCP, 2012 WL

13  2366448, at *6 (Del. Ch. June 21, 2012) (reviewing a severance

14  agreement under the Aronson test).  Because different tests apply

15  to each claim, the Court examines each claim in isolation while

16  remaining mindful of the requirement that the Court "determine

17  whether the totality of Plaintiffs' allegations demonstrate a

18  reasonable doubt about the Board's impartiality."  In re Bidz.com,

19  Inc. Derivative Litig., 773 F. Supp. 2d 844, 860 (C.D. Cal. 2011)

20  (citing Harris v. Carter, 582 A.2d 222, 229 (Del. Ch. 1990)).

21      Under Polycom's certification of incorporation, Polycom limits

22  director liability for breaches of fiduciary duty "[t]o the fullest

23  extent permitted by the Delaware General Corporation Law . . . ."

24  Rucker Decl. Ex. D, Art. IX.  This type of so-called exculpatory

25  clause is authorized by Section 102(b)(7) of the Delaware General

26  Corporation Law, and, contrary to Plaintiffs' assertions, is

27  appropriately considered at the pleading stage in assessing demand

28

1   futility.[4]   See Citigroup, 964 A.2d at 133 (considering an

2   exculpatory clause at the pleading stage in assessing demand

3   futility).   As a result, Plaintiffs must plead with particularity

4   "substantial likelihood that [the Board Members'] conduct falls

5   outside the exemption."   In re Baxter Int'l, Inc. S'holders Litig.,

6   654 A.2d 1268, 1270 (Del. Ch. 1995).   For example, to plead a

7   disclosure violation that falls outside the exculpatory clause,

8   "plaintiffs must plead particularized factual allegations that

9   'support the inference that the disclosure violation was made in

10  bad faith, knowingly, or intentionally.'"   Citigroup, 964 A.2d at

11  132 (quoting O'Reilly v. Transworld Healthcare, Inc., 745 A.2d 902,

12  915 (Del. Ch. Aug. 20, 1999)).

13       Plaintiffs argue that the Board faces a substantial likelihood

14  of personal liability for violations of the duties of loyalty and

15  good faith[5] because the Board Members: (1) failed to oversee and

16  [4] Plaintiffs are mistaken about whether the Court can consider the

17  exculpatory clause on the motion to dismiss, because, as other
    courts have found, "the considerations informing an evaluation of

18  demand futility are not necessarily the same as the appropriate
    considerations in evaluating whether a plaintiff has stated a

19  claim."   Compare In re Maxwell Techs., Inc. Derivative Litig., No.
    13-CV-966-BEN RBB, 2014 WL 2212155, at *8 (S.D. Cal. May 27, 2014),

20  with In re Tower Air, Inc., 416 F.3d 229, 242 (3d Cir. 2005), and
    In re Brown Sch., 368 B.R. 394, 401 (Bankr. D. Del. 2007).   As a

21  result, the Court takes judicial notice of Polycom's certificate of
    incorporation.   See Brown v. Moll, No. C 09-05881 SI, 2010 WL

22  2898324, at *1 n.1, *4 (N.D. Cal. July 21, 2010) (taking judicial
    notice of a certificate of incorporation in assessing a motion to

23  dismiss a derivative suit).

24  [5] Perhaps recognizing that their claims for breaches of the duty of
    care are likely barred by the exculpatory clause, Plaintiffs appear

25  not to press these claims in their opposition.   Compare Compl. ¶¶
    127, 157-58, with Opp'n at 17 ("Director Defendants each breached

26  their duties of loyalty and good faith and wasted Company
    assets . . . ."), Rucker Decl. Ex. D, Art. IX (providing that "no

27  director of the Corporation shall be personally liable to the
    Corporation or its stockholders for monetary damages for breach of

28  fiduciary duty"), and Guttman, 823 A.2d at 501.

**United States District Court**
For the Northern District of California

1  ensure the effectiveness of Polycom's auditing and accounting

2  controls, (2) made or caused to be made financial statements that

3  were false and misleading in light of Miller's conduct and the

4  alleged lack of adequate internal controls, and (3) approved

5  Miller's separation agreement without adequately investigating

6  Miller's misconduct.[6]

7      **A.    <u>The Oversight Claim</u>**

8      Plaintiffs allege that demand is excused on their oversight

9  claim because the board faces a substantial likelihood of personal

10 liability for failing to adequately oversee Polycom's auditing and

11 accounting controls.  In support of this theory, Plaintiffs rely

12 principally on a confidential witness ("CW") who was responsible

13 for reviewing Miller's expense receipts and preparing his expense

14 reports.  During the CW's time at Polycom, he[7] reported to Jill

15 Merken, Polycom's Vice President for Global Sales before allegedly

16 being terminated for refusing to submit Miller's expense reports

17 for including personal expenses.  The CW stated that Miller's

18 improper expenses were "common knowledge," most of Polycom's

---

19 [6] Plaintiffs' complaint also makes claims based on stock

20 repurchases made at allegedly artificially inflated prices.  In
   their motions to dismiss Defendants argue, among other things, that

21 because there were no particularized facts demonstrating the
   Board's knowledge that the stock price was artificially inflated

22 and the repurchases were protected by the business judgment rule,
   it is not substantially likely the Board would face personal

23 liability on these claims.  <u>See</u> <u>Citigroup</u>, 964 A.2d at 137; <u>Silicon</u>
   <u>Graphics</u>, 183 F.3d at 990.  In any event, while Plaintiffs mention

24 the existence of these claims, they make no attempt to respond.
   "[I]n most circumstances, failure to respond in an opposition brief

25 to an argument put forward in an opening brief constitutes waiver
   or abandonment in regard to the uncontested issue." <u>Stichting</u>

26 <u>Pensioenfonds ABP v. Countrywide Fin. Corp.</u>, 802 F. Supp. 2d 1125,
   1132 (C.D. Cal. 2011) (quotation omitted).  As a result, the Court

27 need not address these allegations.

28 [7] For obvious reasons, the CW's gender is not clear.  For
   simplicity the Court will refer to the CW using male pronouns.

1   "'executive assistants knew' and that multiple senior members of

2   the accounting department" were aware as well.  Compl. at ¶ 48.

3   Further, according to the Complaint, "[t]his knowledge reached the

4   highest levels of senior management," and the CW "once had a

5   conversation with Laura Durr, who served as Polycom's

6   Controller . . . and who was appointed Interim Chief Financial

7   Officer by the Director Defendants [in] . . . 2014, about . . .

8   what Durr called Miller's 'unusual expense reports'"  Id. at ¶ 49.

9        The chief problem with this allegation is Plaintiffs' failure

10  to show that it is likely, let alone substantially likely, that the

11  board would face liability on such a claim.  As Delaware courts

12  have made clear, oversight claims are extremely difficult to prove.

13  See In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959, 967

14  (Del. Ch. 1996) (stating that an oversight claim is "possibly the

15  most difficult theory in corporate law upon which a plaintiff might

16  hope to win a judgment").  Directors cannot be held liable on an

17  oversight claim unless "(a) the directors utterly failed to

18  implement any reporting or information system or controls; or (b)

19  having implemented such a system or controls, consciously failed to

20  monitor or oversee its operations thus disabling themselves from

21  being informed of risks or problems requiring their attention."

22  Stone v. Ritter, 911 A.2d 362, 370 (Del. 2006) (emphasis in

23  original).

24       Plaintiffs admit that throughout the relevant period Polycom

25  had internal controls in place.  The Complaint lays out the

26  existence of Polycom's Audit Committee, the Committee's duties, and

27  Polycom's Code of Business Ethics and Conduct, which provides that

28  "Polycom funds must be used only for Polycom business

10

purposes . . . Polycom employees . . . must not use Polycom funds for any personal purpose." Compl. ¶¶ 52-54; see also id. ¶¶ 117-21. Indeed, the confidential witness on whom Plaintiffs rely heavily in support of this claim stated that "Polycom had a tightly-monitored expense report approval process that easily would have uncovered Miller's . . . conduct." Id. ¶ 43. Despite this, Plaintiffs argue at times that the Board "fail[ed] to exercise due care and diligence in the management and administration of the affairs of Polycom by failing to take reasonable steps to ensure that the Audit Committee implemented and assured compliance with adequate expense reimbursement policies and procedures . . . ." Opp'n at 17.

The problem with this allegation is it turns the Caremark inquiry on its head. Rather than plead particularized facts showing that the Board failed to implement or monitor Polycom's internal controls and that, as a result, the Company suffered some loss, Plaintiffs' complaint relies solely on the loss as proof that the internal controls or oversight were inadequate. See, e.g., Compl. ¶ 144 (stating that the Board faces a substantial likelihood of liability for "unreasonably failing to prevent or expeditiously discover and stop the payment of improper expense reimbursements to Miller . . ."). This is insufficient because Delaware law does not allow Plaintiffs to simply presume "that employee wrongdoing would not occur if the directors performed their duty properly." In re Baxter Int'l, Inc. S'holder Litig., 654 A.2d 1268, 1271 (Del. Ch. 1995).

Furthermore, because internal controls were in place throughout the relevant period, Plaintiffs must plead

United States District Court
For the Northern District of California

1  particularized facts demonstrating that "the directors <u>knew</u> they
2  were not discharging their fiduciary obligations or that the
3  directors demonstrated a <u>conscious</u> disregard for their
4  responsibilities such as by failing to act in the face of a known
5  duty to act." <u>Citigroup</u>, 964 A.2d at 123 (emphasis in original).
6  This is a "scienter-based standard . . . ." <u>Desimone v. Barrows</u>,
7  924 A.2d 908, 935 (Del. Ch. 2007).

8     Plaintiffs have not adequately pleaded that the Board knew of
9  problems with Polycom's auditing and accounting controls or
10 consciously disregarded its responsibilities.  For instance, while
11 the CW's statements suggest that Polycom employees (and some
12 management) were aware of the problems with Miller's expense
13 reports, the CW does not say that he ever informed Miller or any of
14 the Board Members of those issues.  Nor do the CW's statements or
15 Plaintiffs' pleadings connect the awareness of some employees and
16 management at Polycom to what the Board should have known.
17 Instead, Plaintiffs simply argue that red flags existed for the
18 board to see "had they not turned a blind eye to their duties to
19 ensure the Company had basic internal controls in place."  Opp'n at
20 22-23.  But Plaintiffs do not identify a single instance where
21 internal controls were disregarded or red flags were ignored.
22 Instead, Plaintiffs' complaint merely shows that some individuals
23 within the company were aware of issues with Miller's expense
24 reports, without providing any basis aside from speculation for
25 determining the board knew or should have known that violations of
26 the law were occurring.  This is insufficient.  <u>See In re MIPS</u>
27 <u>Techs., Inc. Derivative Litig.</u>, No. C-06-06699, 2008 WL 3823726, at
28 *6 (N.D. Cal. Aug. 13, 2008) (rejecting the statement that "members

1   of [board committees] were very aware of what [a company Vice

2   President] was doing . . ." as "hopelessly vague [and] general")

3   (internal quotation marks omitted) (emphasis omitted).  Because a

4   directors' duty to be informed does not "require directors to

5   possess detailed information about all aspects of the operation of

6   the enterprise," the Court cannot simply infer the board knew or

7   should have known of the problems with Miller's expense reports.

8   Caremark, 698 A.2d at 971.

9         As a result, the demand requirement cannot be excused for

10  Plaintiffs' oversight claims.

11        **B.**   **False Financial Statement Claims**

12        Plaintiffs also allege that various public financial

13  statements were materially false and misleading because (1) Miller

14  submitted false expense reports, (2) those false reports caused

15  Polycom to report false and misleading expenses and financial

16  results, (3) Miller violated Polycom's Code of Business Ethics and

17  Conduct and therefore could have been dismissed, and (4) the

18  company lacked effective internal controls.  Plaintiffs argue that

19  demand is excused on these claims because the board faces a

20  substantial likelihood of liability for making these statements.

21        These allegations suffer from similar defects as Plaintiffs'

22  oversight claims.  Most importantly, Plaintiffs have again failed

23  to adequately plead the Directors' state of mind.  "[T]o show a

24  substantial likelihood of liability" for false and misleading

25  statements "that would excuse demand, plaintiffs must plead

26  particularized factual allegations that 'support the inference that

27  the disclosure violation was made in bad faith, knowingly or

28  intentionally.'"  Citigroup, 964 A.2d at 132 (quoting O'Reilly v.

**United States District Court**
For the Northern District of California

1  Transworld Healthcare, Inc., 745 A.2d 902, 915 (Del. Ch. Aug. 20,
2  1999)).

3      Here, Plaintiffs have not pleaded any particularized facts
4  supporting a finding of bad faith, knowledge, or intent to deceive
5  on the part of any of the Directors.  In fact, Plaintiffs have not
6  made any specific allegations about the Director Defendants' state
7  of mind at all, which is necessary to determine whether any
8  allegedly misleading statements were made with knowledge or bad
9  faith.  Maxwell, 2014 WL 2212155, at *12 ("Plaintiffs must allege
10  specific factual allegations to allow a court to analyze the state
11  of mind of individual director defendants, and cannot rely on broad
12  group allegations.") (citing Citigroup, 964 A.2d at 134).  Instead,
13  Plaintiffs ask the Court to infer that because the Director
14  Defendants and members of the Audit Committee had a duty to review
15  Polycom's internal controls, auditing, and financial statements,
16  and signed various statements averring that they did so, they
17  either must have known of the falsity of aspects of those financial
18  statements or turned a blind eye to their duties.  Other courts
19  have rejected this theory, and the Court agrees.  See, e.g.,
20  Accuray, 757 F. Supp. 2d at 928; Maxwell, 2014 WL 2212155, at *11;
21  Wood v. Baum, 953 A.2d 136, 142 (Del. 2008); Citigroup, 964 A.2d at
22  126-27.  Without any particularized allegations explaining what the
23  Directors knew, when they knew it, or anything more than "general
24  allegation[s] that the Board participated" in making or causing
25  false or misleading statements to be made, the Court cannot infer
26  that the board acted in bad faith, knowingly, or with intent to
27  deceive.  Silicon Graphics, 183 F.3d at 990 (finding that "claims
28  rest[ing] on a general allegation that the Board participated in

**United States District Court**
For the Northern District of California

1  [a] fraudulent scheme" are insufficient standing alone); see also

2  Citigroup, 964 A.2d at 132-34.

3      Finally, Plaintiffs allege that the Board caused Polycom to

4  falsely or misleadingly suggest that the Company's investigation of

5  Miller's expense reports was "complete," and failed to promptly

6  inform the public that the SEC began an investigation into the

7  Audit Committee's review of Miller's expenses and subsequent

8  resignation.  The allegedly false or misleading statement appeared

9  in a Form 8-K filed with the SEC on July 23, 2013, and stated that

10 "the Audit Committee of the Board completed a review of certain of

11 Mr. Miller's expense submissions.  The Audit Committee found

12 certain irregularities in these submissions.  At the conclusion of

13 the review, Mr. Miller accepted responsibility" and resigned.

14 Compl. ¶ 111.  In Plaintiffs' view, this statement is false or

15 misleading because it suggests that the inquiry into Miller's

16 expenses was complete "when in fact such a review was ongoing and

17 wouldn't be completed for many months . . . ."  Opp'n at 17-18.

18 The problem with this view is that the statement says that the

19 Audit Committee had completed a review of "certain of Mr. Miller's"

20 expense reports -- not that the Audit Committee had reviewed all of

21 Miller's reports or that no further review of any other reports was

22 ongoing.  Similarly, Plaintiffs again fail to plead any facts about

23 whether the Board acted in bad faith or with intent to deceive in

24 using the word "completed" in reference to the Audit Committee's

25 review or in failing to disclose the existence of the SEC

26 investigation sooner.

27     As a result, the demand requirement cannot be excused for

28 Plaintiffs' claims arising out of allegedly false or misleading

1  statements.

2      **C.    Miller's Separation Agreement and Release**

3      Finally, Plaintiffs allege several issues related to the

4  separation agreement between Polycom and Miller.  First, Plaintiffs

5  believe the separation agreement afforded Miller excessive benefits

6  and constituted corporate waste.  Second, Plaintiffs argue that the

7  Board acted hastily, approving the separation agreement before

8  determining the full scope and impact of Miller's improper expense

9  submissions.  Because Plaintiffs challenge "a discrete

10  transaction," the Court reviews demand futility under the two-prong

11  Aronson test.  Zucker v. Andreessen, No. 6014-VCP, 2012 WL 2366448,

12  at *6 (Del. Ch. June 21, 2012).

13          **1.    First Prong of the Aronson Test**

14      While Plaintiffs largely confine their challenge to the

15  separation agreement to the second prong of Aronson, Plaintiffs'

16  complaint also alleges that the Board was not disinterested and

17  independent in evaluating Miller's separation agreement.  See

18  Compl. ¶¶ 151-52 (arguing that the board did not act independently

19  in negotiating and authorizing Miller's separation from Polycom).

20  Defendants challenge these allegations, and Plaintiffs appear to

21  have abandoned this theory, instead arguing that the separation

22  agreement is not protected by the business judgment rule.

23      Nevertheless, in the interest of completeness, the Court finds

24  that Plaintiffs have failed to raise a reasonable doubt as to the

25  Board's independence.  Directors are independent when their

26  decisions are "based on the corporate merits of the subject before

27  the board rather than extraneous considerations or influences."

28  Aronson, 473 A.2d at 816.  "When alleging lack of independence in

United States District Court
For the Northern District of California

the demand futility context, 'a plaintiff charging domination and control of one or more directors must allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the [person] doing the controlling.'" Bidz.com, 773 F. Supp. 2d at 853 (quoting Aronson, 473 A.2d at 816).

Here it strains credulity to conclude that the Board was simultaneously so beholden to Miller that it could not independently negotiate his departure from the company and sufficiently independent to initiate an internal investigation, confirm Miller's wrongdoing, and obtain his departure from the Company. Id. at ¶ 152. Another court has found that similar allegations of a lack of independence were unavailing under circumstances like these, and the Court concurs. Andropolis v. Snyder, No. 05 CV 01563 EWN BNB, 2006 WL 22226189, at *9 (D. Colo. Aug. 3, 2006) ("It is difficult to conceive that a majority of the Board was so 'beholden' to Defendant [Miller], yet they were able to initiate an internal investigation and force Defendant [Miller's] [departure].").

## 2.   **Second Prong of the Aronson Test**

To show demand futility under Aronson's second prong, Plaintiffs must plead particularized facts raising a reasonable doubt that the transaction is protected by the business judgment rule.  The business judgment rule is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." Aronson, 473 A.2d at 812.  To rebut this presumption, "plaintiffs must plead

1  particularized facts sufficient to raise (1) a reason to doubt that

2  the action was taken honestly and in good faith or (2) a reason to

3  doubt that the board was adequately informed in making the

4  decision." In re Walt Disney Co. Derivative Litig., 825 A.2d 275,

5  286 (Del. Ch. 2003).

6       Plaintiffs argue they have raised a reasonable doubt as to

7  whether the approval of the separation agreement was a valid

8  exercise of business judgment because the agreement constituted

9  corporate waste.  Waste requires a "showing that the board's

10  decision was so egregious or irrational that it could not have been

11  based on a valid assessment of the corporation's best interests."

12  White v. Panic, 783 A.2d 543, 554 n.36 (Del. 2001).  "Where . . .

13  the corporation has received 'any substantial consideration' and

14  where the board has made 'a good faith judgment that in the

15  circumstances the transaction was worthwhile' a finding of waste is

16  inappropriate, even if hindsight proves that the transaction may

17  have been ill-advised." Protas v. Cavanagh, No. 6555-VCG, 2012 WL

18  1580969, at *9 (Del. Ch. Mar. 30, 2012) (quoting Lewis v.

19  Vogelstein, 699 A.2d 327, 336 (Del. Ch. 1997)).

20       Plaintiffs cannot satisfy this test for two reasons.  First,

21  Polycom received substantial consideration under the agreement.

22  Under the terms of the agreement, Miller received $500,000 cash,

23  continued bonus eligibility for the first half of 2013 (the

24  agreement was entered into on July 22, 2013 and his bonus

25  eventually amounted to $320,625), reimbursement for COBRA expenses,

26  and was allowed to keep his company computer and other mobile

27  electronic equipment.  Miller also continued to receive his base

28  salary through August 15, 2013, and was able to collect previously

**United States District Court**
For the Northern District of California

unvested stock awards. In exchange for those benefits to Miller, Polycom received a release of Miller's employment-related claims, an agreement to assist Polycom during its leadership transition, Miller's voluntary resignation from the board (without requiring a shareholder vote), and various other contractual protections like non-disparagement and anti-solicitation provisions. As another court recently found while assessing a similar separation agreement, these provisions "clearly provide benefits to [Polycom]." Maxwell, 2014 WL 2212155, at *16.

Second, because "Plaintiffs do not raise any reasonable doubt that this decision fell outside the outer limits of the Board's broad discretion to determine how to compensate [Miller]," the question of whether the benefits to Polycom justify the costs in benefits to Miller remains "a business decision for the Board." Id. Two points support this conclusion. First, Defendants note that while the separation agreement may, in isolation, appear to confer excessive benefits on Miller, Plaintiffs ignore that Miller was already entitled to compensation by virtue of his preexisting contractual relationship with Polycom and do not allege that he received more than he would have received had the Board terminated him for cause. Second, and even more importantly, as the Board Members repeatedly point out, the separation agreement does not release Polycom's potential claims against Miller. As a result, the separation agreement protected Polycom from potential future litigation by Miller, while still preserving the Board's prerogative to bring suit against Miller if the Board later discovered grounds for doing so.

Nevertheless, Plaintiffs argue that even if there is no reason

**United States District Court**
For the Northern District of California

1  to doubt the Board's honesty and good faith, the Board is still not

2  entitled to business judgment protection because it was not

3  adequately informed prior to entering into the separation

4  agreement.  In support of these arguments, Plaintiffs relies on In

5  re Walt Disney Co. Derivative Litigation, 825 A.2d 275 (Del. Ch.

6  2003), which they argue demonstrates the Board's bad faith and

7  failure to exercise its business judgment "on facts similar to, but

8  even less damaging than this case."  Opp'n at 18.  In Disney, the

9  court found that the plaintiffs' allegations demonstrated that

10 Disney's directors failed to exercise "any business judgment and

11 failed to make any good faith attempt to fulfill their fiduciary

12 duties" because the board abdicated all responsibility regarding an

13 executive's termination agreement.  825 A.2d at 278 (emphasis in

14 original).  Specifically, the Disney board "(1) failed to ask why

15 it had not been informed; (2) failed to inquire about the

16 conditions and terms of the agreement; and (3) failed even to

17 attempt to stop or delay the termination until more information

18 could be collected."  Id. at 289.  Nonetheless, the Disney court

19 recognized that "[i]f the board had taken the time or effort to

20 review these or other options, perhaps with the assistance of

21 expert legal advisors, the business judgment rule might well

22 protect its decision."  Id.

23     Defendants rightly argue that was the case here.  Unlike the

24 board's "ostrich-like approach" in Disney, the Board here did not

25 abdicate its responsibilities to be informed entirely or allow

26 conflicts of interest to infect the process.  On the contrary, the

27 Board was aware of the issues with Miller's expense reports at the

28 time it entered into the separation agreement, had conducted an

internal investigation into certain of Miller's expense reports,
and was represented by independent legal counsel in an arms-length
negotiation.  Furthermore, Plaintiffs do not allege that the Board
did not understand the terms of Miller's separation agreement.
Plaintiffs' only complaint is that the Board did not gather more
information before acting.  But "[t]he business judgment rule . . .
only requires the board to _reasonably_ inform itself; it does not
require perfection or the consideration of every conceivable
alternative."  In re Goldman Sachs Grp. Inc. S'holder Litig., Civ.
A. No. 5215-VCG, 2011 WL 4826104, at *16 (Del. Ch. Oct. 12, 2011)
(emphasis in original).  The Court is persuaded under these
circumstances the Board was reasonably informed at the time the
separation agreement was negotiated and approved, and as a result
their actions are protected by the business judgment rule.

As a result, the demand requirement cannot be excused for
Plaintiffs' claims arising out of the separation agreement.

**D.   Demand Futility as to the Audit Committee**

Finally, Plaintiffs argue that even if they have inadequately
pleaded demand futility to Atkins and Owens, the Court should still
find demand futile because the members of the Audit Committee,
Kelley, Mercer, and Parker, faced a substantial likelihood of
liability for inadequate oversight and for the allegedly false and
misleading financial statements.  Plaintiffs' chief support for
this argument is the charter for Polycom's Audit Committee, which
lays out the Committee's responsibilities, and various reports and
financial statements in which the Audit Committee members
reiterated their duties to review Polycom's "internal controls
processes, audit processes, and financial statements," and

United States District Court
For the Northern District of California

acknowledged that they had done so.  Opp'n at 23; Compl. ¶¶ 145-50.
Because the Audit Committee was responsible for and repeatedly
averred that it had reviewed Polycom's internal controls, auditing,
and finances, Plaintiffs conclude the Audit Committee "expressly
acknowledged having contemporaneous and direct access to specific,
material facts that contradicted and demonstrated the misleading
nature of the . . . challenged statements, and to facts
demonstrating Polycom's inadequate internal controls."  Compl. ¶
146; Opp'n at 23.

     The problem with this argument is that it is "contrary to
well-settled Delaware law" to infer a culpable state of mind based
solely on membership on the Audit Committee.  Wood, 953 A.2d at
142.  So, for example, in Rattner v. Bidzos, No. Civ.A. 19700, 2003
WL 22284323 (Del. Ch. Apr. 7, 2003), Vice Chancellor Noble
addressed a similar demand futility theory specifically targeting
the members of a corporation's audit committee.  In Rattner, as
here, the complaint "sets forth vast tracts of quoted materials
from public sources detailing wrongdoing in the form of alleged
misstatements" and alleged a failure of oversight in ignoring a red
flag.  But, as the Court found, these allegations were insufficient
to plead demand futility as to audit committee members because
plaintiffs failed to plead "any . . . particularized facts
regarding . . . the actions and practices of [the company's] audit
committee."  Id. at *12-13.  Instead, "[t]he only information one
can snare from the Amended Complaint is that there exists a body of
rules regarding the accuracy of recording and reporting financial
information which may have been violated."  Id. at *13.  As a
result, "[t]he most I can safely admit knowledge of is that

**United States District Court**
For the Northern District of California

[Kelley], [Mercer], and [Parker] were members of the Audit

Committee during the Relevant Period and, thus, that [Polycom] had

an Audit Committee."   Id.

Stripping away Plaintiffs' conclusory and rhetorical use of

phrases like "blind eye," "consciously or recklessly," and "knew or

recklessly disregarded," it is clear that Plaintiffs' sole basis

for determining the Audit Committee's state of mind is the access

to information their position on the Audit Committee conferred.

That sharply distinguishes this case from the three cases on which

Plaintiffs rely in support of this argument.   For example, in In re

Veeco Instruments, Inc. Securities Litigation, 434 F. Supp. 2d 267

(S.D.N.Y. 2006), plaintiffs' complaint detailed the company and,

specifically, the audit committee's failure over 27 separate

meetings to respond to two whistleblower reports, an internal audit

that found multiple violations of law, and reduction of its

accounting staff to only two people.   Id. at 277-78.   Unlike Veeco,

the Complaint here includes no allegations that the Polycom was

aware (or informed by the CW or other whistleblower) of Miller's

violations of the expense reimbursement policy, failed to heed

those warnings, reduced or eliminated internal auditing or

controls, or that the Audit Committee repeatedly ignored those

issues.   Instead, as in another case rejecting a similar theory,

there is no allegation the issues with Miller's expense reports

were brought to the Audit Committee's attention, and the fact that

they "should have examined the financial statements does not

establish that they should have known there were problems in the

documents."   Maxwell, 2014 WL 2212155, at *14.

As a result, the demand requirement cannot be excused based on

potential liability for the Audit Committee.

**E.    Does the Weight of the Evidence Raise a Reasonable Doubt as to the Board's Impartiality?**

Having assessed each of Plaintiffs' allegations standing alone, Delaware law requires the Court to determine "whether the totality of Plaintiffs' allegations demonstrates a reasonable doubt about the Board's impartiality." Bidz.com, 773 F. Supp. 2d at 861. The Court finds that Plaintiffs' allegations, whether considered standing alone or in their totality, do not demonstrate that demand would have been futile.

**V.    CONCLUSION**

For the reasons set forth above, Plaintiffs have failed to allege demand futility with particularity.  Accordingly, the motion to dismiss is GRANTED.  Defendants also moved in the alternative dismiss for failure to state a claim under Rule 12(b)(6).  Because the Court grants dismissal on other grounds, that motion is DENIED without prejudice as moot.  Nevertheless, the Court is mindful of the Ninth Circuit's liberal policy favoring granting leave to amend.  As a result, the dismissal is without prejudice and the Court GRANTS leave to amend within thirty (30) days of the signature date of this order to address the issues identified above.


IT IS SO ORDERED.


Dated: January 13, 2015      _____

UNITED STATES DISTRICT JUDGE